UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

No. _____-CV-_____

| | |
|---|---|
| VICTOR MIRIYALA, Individually and on Behalf of All Others Similarly Situated, ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, ) ) ) | |
| vs. ) ) | CLASS ACTION |
| NOVAN, INC., NATHAN STASKO, RICHARD D. PETERSON, ROBERT A. INGRAM, W. KENT GEER, ROBERT J. KEEGAN, G. KELLY MARTIN, SEAN MURPHY, JOHN W. PALMOUR, PIPER JAFFRAY & CO., JMP SECURITIES LLC, and WEDBUSH SECURITIES INC., ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. ) ) ) | |

Plaintiff Victor Miriyala ("Plaintiff"), by and through Plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, announcements, and U. S. Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Novan, Inc. ("Novan" or "Company"); analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class ("Class") consisting of all persons other than Defendants who purchased or otherwise acquired Novan stock: (1) pursuant and/or traceable to Novan's false and misleading Registration Statement and Prospectus, issued in connection with the Company's initial public offering on or about September 26, 2016 ("IPO"); and/or (2) on the open market between September 26, 2016 and January 26, 2017, inclusive ("Class Period"), seeking to recover damages caused by the Defendants' violations of the Securities Act of 1933 ("Securities Act") and the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Novan is a clinical-stage drug development company that focuses on the development and commercialization of nitric oxide-based therapies in dermatology. Novan was incorporated in January 2006 under the laws of Delaware and its subsidiaries were organized in May 2015 under the laws of North Carolina.

3.     Leading up to and during the Class Period, Defendants represented that Novan had commenced two identically designed Phase 3 clinical trials of SB204, a once-daily, topical gel for the treatment of acne vulgaris. SB204 was the Company's lead product candidate, and information regarding its development and commercialization was important to investors.

4.     In the Offering documents (the Registration Statement and Prospectus are collectively the "Offering Documents") and throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and outlook, specifically regarding SB204. For example, Defendants repeatedly stated that Novan had commenced and performed two *identically designed* Phase 3 clinical trials of SB204. Defendants' statements falsely stated that the two Phase 3 clinical trials were identical and omitted specific facts as to why the two critical trials were, in fact, not identical. As a result of these false statements, the Company's outlook and expected financial performance were not accurately represented to the market at all relevant times.

5.     During the Class Period, the price of Novan stock climbed significantly above the IPO price of $11.00 per share, reaching as high as $29.09 on December 7, 2016.

6.     Before the market opened on January 27, 2017, Novan announced the top-line results of its two "identical" Phase 3 clinical trials of SB204.  Although the drug hit all of its goals in one of the trials, dubbed NI-AC302, it failed to beat a placebo in the other separate Phase 3 study, called NI-AC301.

7.     On news of the discordant results in what were described to be two identical studies, the price of Novan stock dropped.  After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than eight million shares.

8.     Subsequent disclosures regarding SB204 demonstrated that the two Phase 3 clinical trials of SB204 were not "identical."

9.     Following these disclosures, several executives left the Company.  On March 22, 2017, Novan announced that its Chief Financial Officer ("CFO"), defendant Richard Peterson ("Peterson"), was leaving and would be replaced, "effective immediately," by interim CFO William L. Hodges ("Hodges").  On May 5, 2017, Novan disclosed that the Company's Chief Medical Officer ("CMO"), M. Joyce Rico ("Rico"), had resigned.  Then, on June 5, 2017, Novan announced that it was replacing its Chief Executive Officer ("CEO") and co-founder, defendant Nathan Stasko ("Stasko"), with G. Kelly Martin ("Martin"), a member of the Company's Board of Directors ("Board"), who would become interim CEO. Novan also announced that it was laying off 20% of its workforce and that despite previously

- 3 -

assuring investors that it was committed to SB204, Novan was executing a plan to turn its focus to earlier-stage compounds.

10. Following the Company's June 5, 2017 disclosures, the price of Novan stock fell 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling 4% to close at $4.45.

11. Additional disclosures on August 2, 2017 informed the market that Novan would be retreating further from SB204, stating that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity." On this news, the price of Novan stock declined from $5.48 on August 1, 2017, to $4.54 on August 2, 2017, a drop of more than 17%.

12. As a result of Defendants' wrongful acts and omissions described herein, and the significant declines in the market value of Novan stock, Plaintiff and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

- 4 -

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

15. Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District. Novan's headquarters are located in this District at 4105 Hopson Road, Morrisville, North Carolina 27560.

16. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17. Plaintiff Victor Miriyala purchased Novan stock as described in the attached certification, which is incorporated herein by reference, pursuant and/or traceable to the IPO, and suffered damages as a result of the conduct alleged herein.

18. Defendant Novan, Inc. is incorporated in Delaware and has its headquarters in this District. Shares of Novan stock trade on the NASDAQ under the ticker symbol "NOVN."

19. Defendant Nathan Stasko, Ph.D. was the President and CEO of Novan, and is also a member of Novan's Board. Stasko was replaced as CEO on June 5, 2017, but

remained with the Company. Stasko signed the Registration Statement used in connection with the IPO.

20. Defendant Richard D. Peterson was Novan's CFO, until he was replaced, effectively immediately, on March 22, 2017, when the Company announced it would appoint an interim CFO and search for a permanent replacement. Peterson signed the Registration Statement used in connection with the IPO.

21. Defendant Robert A. Ingram ("Ingram") is a member of Novan's Board and was named Chairman in February 2016. Ingram signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Ingram's behalf.

22. Defendant W. Kent Geer ("Geer") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Geer's behalf.

23. Defendant Robert J. Keegan ("Keegan") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Keegan's behalf.

24. Defendant G. Kelly Martin is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Martin's behalf.

25. Defendant Sean Murphy ("Murphy") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Murphy's behalf.

26. Defendant John W. Palmour, Ph.D. ("Palmour") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Palmour's behalf.

27. Defendants Stasko, Peterson, Ingram, Geer, Keegan, Martin, Murphy, and Palmour are collectively referred to as the "Individual Defendants." Each of the Individual

Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Novan and as signatories to the Registration Statement used in connection with the IPO.

28. Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and asset management firm located in Minneapolis, Minnesota that offers financial advisory and securities brokerage services. Piper Jaffray acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO.

29. Defendant JMP Securities LLC acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO.

30. Defendant Wedbush Securities Inc. acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO.

31. The Defendants named in ¶¶28-30 are collectively referred to as the "Underwriter Defendants." The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement for the IPO and collectively received discounts and commissions of approximately $3,630,550 in connection with the IPO. In addition, Novan granted the Underwriter Defendants an option to purchase up to an additional 615,000 shares of common stock at the IPO price, less the underwriting discount, for a period of 30 days after the IPO.

32. The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately, and free from misstatements or omissions of material fact. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Novan stock during the Class Period, including: (i) all persons or entities who acquired Novan stock pursuant and/or traceable to the IPO; and (ii) all persons who purchased the Novan stock on the open market during the Class Period.  Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Novan trades on the NASDAQ and has millions of shares outstanding, owned by hundreds, if not thousands, of persons.

35.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

        (a)     whether Defendants violated the Securities Act and the Exchange Act;

        (b)     whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about Novan;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether – as to the Exchange Act claims only – Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether – as to the Exchange Act claims only – the price of Novan stock was artificially inflated; and

(f)     the extent of damages sustained by Class members and the appropriate measure of damages.

36.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

37.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS OF THE SECURITIES ACT CLAIMS

39.     Novan describes itself as a late-stage pharmaceutical company focused on "redefining the standard of care in dermatology through the development and commercialization of innovative therapies using [Novan's] nitric oxide releasing platform."

According to Novan, nitric oxide plays a vital role in the natural immune system response against microbial pathogens and is an important regulator of inflammation. Novan states that the two key components of its nitric oxide platform are Nitricil technology, which drives the creation of "new chemical entities" or "NCEs," and its topical formulation science, both of which are used to "tune [Novan's] product candidates for specific indications."

40. There is, however, only one FDA approved use of nitric oxide, which is for the treatment of pulmonary hypertension in neonatal infants with nitric oxide gas. However, the delivery of nitric oxide from a gas tank is inconvenient and limits practical applications. The scarcity of nitric oxide-based products is due to the historical challenges associated with developing safe and effective approaches for the chemical storage and controlled release of a gas for therapeutic applications. Synthetic approaches for creating molecules that store nitric oxide in solid form have significant limitations that have prevented the translation of these laboratory chemistries into commercially viable products. According to Novan, some of the key limitations include:

- **Lack of tunability** – Therapeutic delivery of nitric oxide to patients at safe and effective levels requires the ability to control the release rate to selectively modulate a specific disease pathology. Other chemical approaches release or donate nitric oxide either too fast or too slow, rendering them potentially unsafe or therapeutically ineffective.

- **Unfavorable stability profile** – Most nitric oxide-loaded molecules in development decompose too rapidly, prematurely releasing nitric oxide and impairing shelf life stability. Based on the chemistries involved, slight increases in temperature, exposure to ambient humidity or irradiation with light all significantly diminish nitric oxide potency.

- **Low storage capacity** – Other small molecule strategies only permit the loading, or storage, of one or two units of nitric oxide per unit of drug,

leaving them with an inability to deliver sufficient therapeutic quantities of nitric oxide to the desired site. Conversely, macromolecular scaffolds to date have had limited storage sites to bind nitric oxide as a percentage of total weight.

•    **Lack of targeting** – Other nitric oxide-based approaches are primarily small molecule-based and are limited in their ability to be delivered to or target specific tissues, and the organ destination or systemic half-life is dictated by the molecule to which nitric oxide was attached.

•    **Backbone toxicity** – Several small molecules developed in laboratory settings used to store nitric oxide have never been translated into clinical use due to the carcinogenic potential of nitrosamines or risk of cyanide poisoning from sodium nitroprusside.

41.    At all relevant times, the Company's lead product candidate was SB204, a once-daily, topical gel for the treatment of acne vulgaris. Novan represented to investors that the Company's nitric oxide "platform" harnessed the potential of nitric oxide in a manner that "leads to the creation of differentiated product candidates that address all these limitations [of nitric oxide] by (1) engineering tunable NCEs using [Novan's] Nitricil technology and (2) using [Novan's] formulation science to customize the drug delivery method for the anatomical location of a skin disease."

42.    In the first quarter of 2016, the Company commenced what it described as "two *identically designed* Phase 3 pivotal clinical trials of SB204" to evaluate its safety and efficacy. The Company represented to investors that it completed enrollment in both trials ahead of schedule by randomizing the last patient in September 2016, bringing the total number of enrolled patients to 2,600. Per the study protocol, the last patient randomized would be treated for 12 weeks. The Company represented to investors that it expected to report top-line results from the two parallel trials in the first quarter of 2017, and that

- 11 -

"[a]ssuming successful completion of [Novan's] Phase 3 clinical trials and [Novan's] long-term safety study, [Novan was] targeting submission of [its] new drug application, or NDA, for SB204 to the U.S. Food and Drug Administration, or the FDA, by the end of 2017."

43.     On August 24, 2016, Novan filed a Registration Statement on Form S-1 with the SEC.  An amended Registration Statement was filed on September 8, 2016, and a second amended Registration Statement was filed on September 20, 2016.  On September 20, 2016, the SEC declared the Registration Statement effective, pursuant to which the Company offered 4,100,000 shares of its common stock for $11.00 each.  The Prospectus was filed with the SEC on September 22, 2016.

44.     In connection with the IPO, the Company granted the Underwriter Defendants a 30-day option to purchase up to an additional 615,000 common shares at the IPO price less underwriting discounts and commissions.

45.     Novan common stock was listed and began actively trading on the NASDAQ on September 26, 2016.  The Company sold an aggregate of 4,715,000 shares of common stock under the Registration Statement on Form S-1 declared effective by the SEC on September 20, 2016, at a public offering price of $11 per share, for aggregate proceeds of $51,865,000.  After deducting underwriter discounts and commissions, net proceeds to the Company were $44,595,000.

46.     The Offering Documents described Novan's business and the nature of each of its products, set forth its historical financial data, described SB204, and provided the terms of the IPO.  The Offering Documents incorporated by reference the Prospectus and the exhibits

to the Registration Statement. The Registration Statement was signed by the Individual

Defendants.

47.    The Registration Statement stated, in relevant part:

Our lead product candidate is SB204, a cosmetically elegant topical gel that targets multiple mechanisms of action for the treatment of acne vulgaris, the most common skin disease in the United States. *We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017.* Assuming successful completion of a long-term safety study in the second half of 2017, we are targeting submission of a new drug application, or NDA, for SB204 by year-end 2017.

48.    Discussing SB204 and its treatment of acne, the Registration Statement

disclosed:

We are developing our lead product candidate, SB204, as a once-daily, fast-acting, topical first-line monotherapy for the treatment of acne vulgaris. *In the first quarter of 2016, we commenced two identically designed Phase 3 pivotal clinical trials of SB204 in which we expect to enroll a total of 2,600 patients with acne vulgaris, and we expect top-line results in the first quarter of 2017.* Acne vulgaris is the most common skin disease in the United States, affecting approximately 40 to 50 million Americans annually, according to the American Academy of Dermatology. We believe the current treatment landscape significantly underserves patient needs due to the difficulty of balancing efficacy, systemic safety and cutaneous tolerability. Prior to initiating our Phase 3 trials, our 630-patient clinical program for SB204 included one first-in-human trial, six Phase 1 clinical trials and two Phase 2 clinical trials involving patients suffering from acne vulgaris, in each of which SB204 was well tolerated. In each of our Phase 2 clinical trials, we observed statistically significant reductions in both inflammatory and non-inflammatory lesion counts after 12 weeks of treatment. *We designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our NDA for SB204 to the FDA by the end of 2017.*

- 13 -

49.     Describing the Phase 3 clinical trials for SB204, the Registration Statement

added:

> The conduct of a Phase 3 clinical trial is a complex process that differs from clinical trials conducted in earlier phases.  While some of our employees have conducted Phase 3 clinical trials in the past while employed at different companies, we, as a company, have not conducted a Phase 3 clinical trial before, and as a result, may require more time and incur greater costs than we anticipated.  ***We commenced two identically designed Phase 3 pivotal clinical trials of our lead product candidate, SB204, for the treatment of acne vulgaris in the first quarter of 2016.***  Failure to complete, or delays experienced in, our clinical trials, or failure to commence any planned clinical trials would prevent us from, or delay us in, obtaining regulatory approval of and commercializing our product candidates.

50.     Further discussing the Company's business strategy, the Registration Statement

added:

> Our strategy is to develop and commercialize novel nitric oxide-based therapies that redefine the standard of care in dermatology.  We are focused on creating topical, dermatological therapies in indications with underserved patient populations and well-defined clinical and regulatory development pathways. In order to pursue our strategy, we plan to:
>
> •       ***Complete development of our late-stage product candidate, SB204 and submit for regulatory approval in the United States.  In the first quarter of 2016, we initiated two identically designed Phase 3 pivotal clinical trials for our lead product candidate, SB204 to treat acne vulgaris, and we expect to report top-line results in the first quarter of 2017.  These trials are designed to further evaluate the safety and efficacy of SB204 in 2,600 patients with acne vulgaris.  Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submitting our NDA to the FDA for SB204 by the end of 2017.***

51.     The Registration Statement also described the protocol for the Phase 3 clinical

trials of SB204, and stated, in relevant part:

> ***The protocol for our two Phase 3 pivotal clinical trials is based on feedback from our end-of-Phase 2 meeting with the FDA in September 2015.***

- 14 -

Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submission of our NDA to the FDA for SB204 by the end of 2017.

\*       \*       \*

We believe that SB204 has the potential to redefine the standard of care in acne vulgaris, and if approved will be the first NCE specifically developed for the treatment of acne vulgaris in more than 20 years.

\*       \*       \*

Phase 3 Clinical Program

***Based on the results from our development program to date, we initiated two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 with SB204 4% once-daily.  We have completed an end-of-Phase 2 meeting with the FDA and submitted the protocols for the Phase 3 program under a special protocol assessment, or SPA, for review by the FDA.  We have reached agreement with the FDA on the primary endpoints for our Phase 3 clinical trials, but do not intend to pursue a full formal SPA agreement with the FDA.***  We have also completed the non-clinical studies and chemistry, manufacturing and controls, or CMC, activities required to support initiation of the following clinical trials:

- NI-AC301 and NI-AC302: two multi-center, randomized, double-blind vehicle-controlled Phase 3 clinical trials assessing the safety and efficacy of SB204 4% dosed once-daily in patients with acne vulgaris over 12 weeks.  Each of these trials will consist of approximately 1,300 patients.

- NI-AC303: a long-term multi-center, open-label safety trial assessing the safety of treatment with a SB204 4% once-daily for up to 40 weeks, in eligible patients who have completed 12 weeks of treatment in the NI-AC301 or NI-AC302 trials.

\*       \*       \*

The co-primary efficacy endpoints in our Phase 3 clinical trials are:

- the absolute change in inflammatory lesion counts from baseline to week 12 or ET;

- the absolute change in non-inflammatory lesion counts from baseline to week 12 or ET; and

- the proportion of success according to the dichotomized investigator global assessment, or IGA. A patient will be considered a success if the IGA at week 12/ET is either "clear", with a score of 0, or "almost clear", with a score of 1, and is at least two grades below the baseline score.

52. The IPO Prospectus added similar information regarding the SB204 Phase 3 clinical trials. Specifically, it included statements regarding the Company's discussions with the FDA over the Phase 3 clinical trial design for SB204 and that the Company did not have a special protocol assessment from the FDA, stating, in relevant part:[1]

We currently do not have an SPA in place with respect to any of our product candidates. We have previously made such a submission for an SPA to the FDA in connection with the design of our Phase 3 clinical trials for SB204. ***We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA.*** We recognize that the feedback obtained in connection with the SPA discussions does not constitute a formal SPA or a binding declaration from the FDA that it agrees with the Phase 3

---

[1] According to Novan:

The FDA's SPA process is designed to facilitate the FDA's review and approval of drugs by allowing the FDA to evaluate the proposed design and size of clinical trials that are intended to form the primary basis for determining a drug product's efficacy. Upon specific request by a clinical trial sponsor, the FDA will evaluate the protocol and respond to a sponsor's questions regarding, among other things, primary efficacy endpoints, trial conduct and data analysis, within 45 days of receipt of the request. The FDA ultimately assesses whether the protocol design and planned analysis of the trial are acceptable to support regulatory approval of the product candidate with respect to the effectiveness of the indication studied. All agreements and disagreements between the FDA and the sponsor regarding an SPA must be clearly documented in an SPA letter or the minutes of a meeting between the sponsor and the FDA.

clinical trials' design, clinical endpoints or statistical analysis plan. We may, in the future, decide to make a submission for an SPA for any of our current or future product candidates.

53.     The Offering Documents, including the materials incorporated therein by reference, were negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made not misleading at the time they were made, and were not prepared in accordance with the rules and regulations governing their preparation. The Offering Documents:

(a)     falsely described the two Phase 3 clinical trials for SB204, NI-AC301, and NI-AC302, as "identical," when, in fact, one of the trials included a specific patient population – women on oral contraceptive prescriptions – that was not present in the other clinical trial;

(b)     omitted disclosure of key aspects of the Company's business, specifically distinctions within the Company's SB204 product and Phase 3 clinical tests that were requested by the FDA, which undermined the likelihood that SB204 would achieve its study endpoints;

(c)     omitted that the FDA had encouraged Novan, as part of its discussions regarding the SPA for the Phase 3 trials, to evaluate treatment effectiveness of SB204 in women on oral contraceptive prescriptions, such as Yaz or Ortho-Tricyclen, and that the inclusion of such women in one of the SB204 trials, but not the other, was likely to impact the Phase 3 clinical trial results;

(d)     omitted information regarding SB204, leaving investors unable to accurately assess the validity of Defendants' statements regarding the status of SB204 and its potential for commercialization; and

(e)     as a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

54.     In addition, the Offering Documents and Defendants' other statements omitted material information required by Item 303 of Regulation S-K.  Item 303 requires the disclosure of all "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues."  In addition to the identification of such "known trends," Item 303 specifically requires disclosure of: (a) whether those trends have had or are reasonably expected to have a material negative impact on revenue; and (b) the extent of any such impact on revenue.

55.     Accordingly, the SEC has repeatedly emphasized that the "specific provisions of Item 303 require disclosure of forward-looking information."  Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. . . with particular emphasis on the registrant's prospects for the future."  *See Management's Discussion & Analysis of Financial Condition & Results of Operations; Certain Investment Company Disclosures*, S.E.C. Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material forward-looking information

regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Commission Guidance Regarding Management's Discussion & Analysis of Financial Condition & Results of Operations*, S.E.C. Release No. 8350, 81 S.E.C. Docket 2905, 2003 WL 22996757, at *11 (Dec. 19, 2003) (footnote omitted).

56.     Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operation." *See Management's Discussion*, 1989 WL 1092885, at *4.

57.     Accordingly, the Offering Documents and Defendants' other statements' omission of facts regarding SB204 constitutes a violation of Item 303 and renders the Offering Documents and other statements materially false and misleading.

58.     Likewise, the Offering Documents failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made the IPO speculative or risky to investors was the fact that, at the time of the IPO, the Company was not disclosing important facts regarding SB204 and the Phase 3 clinical trials that were underway.

# COUNT I

## For Violations of Section 11 of the
## Securities Act Against All Defendants

59. Plaintiff incorporates ¶¶1-58 as though fully set forth herein. With respect to this Count, Plaintiff excludes any and all allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

60. This Count is brought against all Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and the other members of the Class who purchased Novan stock in or traceable to the Company's IPO.

61. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

62. Defendants are strictly liable to Plaintiff and the other members of the Class for the misstatements and omissions.

63. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

64. By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

65. Plaintiff acquired Novan common stock pursuant and/or traceable to the IPO.

66.     Plaintiff and the other members of the Class have sustained damages.  The value of Novan stock has declined substantially subsequent to and due to Defendants' violations of the Securities Act.

67.     At the time of their purchase of Novan stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Plaintiff commenced this action.  Less than three years has elapsed between the time the shares upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### For Violations of Section 15 of the Securities Act
### Against the Company and the Individual Defendants

68.     Plaintiff incorporates ¶¶1-58 as though fully set forth herein.

69.     This Count is brought pursuant to Section 15 of the Securities Act on behalf of the Class against the Company and the Individual Defendants.

70.     The Individual Defendants each were control persons of Novan by virtue of their positions as directors and/or senior officers of Novan.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Novan.  The Company controlled the Individual Defendants and all of Novan's employees.

- 21 -

71.     The Individual Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the Count above, based on their having signed, or authorized the signing of, the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## SUBSTANTIVE ALLEGATIONS OF THE EXCHANGE ACT CLAIMS

72.     Plaintiff incorporates ¶¶1-58 as though fully set forth herein, including the false statements and omissions made in the Offering Documents.

73.     On November 14, 2016, the Company issued a release reporting its financial results for the third quarter ended September 30, 2016.  The release stated, in relevant part:

> Novan is developing:
>
> •      SB204 for the treatment of acne vulgaris, or acne.  ***The Company announced Sept. 28, 2016, that the two identically designed Phase 3 pivotal clinical trials for SB204 were fully enrolled ahead of schedule. Novan expects to announce top-line results from these parallel pivotal trials in the first quarter of 2017. Assuming successful completion of these Phase 3 pivotal trials and the long-term safety study, the Company is targeting submission of a new drug application for SB204 to the U.S. Food and Drug Administration by the end of 2017.***

74.     On November 14, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter ended September 30, 2016 ("3Q16 10-Q").  The 3Q16 10-Q was signed by Stasko and Peterson, and included Sarbanes-Oxley certifications signed by each of them attesting that the 3Q16 10-Q did not contain any untrue statements of material fact or omit any material fact necessary to make the statements made not misleading.  Regarding SB204, the 3Q16 10-Q stated, in relevant part:

The current activities, recent developments, and key milestones related to our clinical stage drug candidates are summarized below:

• SB204 for the Treatment of Acne Vulgaris (Phase 3) – We are developing our lead product candidate, SB204, as a once-daily, topical monotherapy for the treatment of acne vulgaris. *In the first quarter of 2016, we commenced two identically designed Phase 3 pivotal clinical trials of SB204 to evaluate safety and efficacy. We completed enrollment in both trials ahead of schedule by randomizing the last patient in September 2016, bringing the total number of enrolled patients to 2,600. Per the study protocol, the last patient randomized will be treated for 12 weeks. We expect to report top-line results from the two parallel trials in the first quarter of 2017. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our new drug application, or NDA, for SB204 to the U.S. Food and Drug Administration, or the FDA, by the end of 2017.*

We also completed a pharmacokinetic study in adolescents with moderate to severe acne during the third quarter of 2016. Patients were treated with SB204 4% once daily for 21 days. There was no detectable systemic exposure to the parent compound, NVN1000, and no change in endogenous nitrate levels after single or repeat dosing. The exposure data from this study is consistent with our previously reported pharmacokinetic data in adults, which also demonstrated no detectable systemic exposure to the parent compound, NVN1000, and no change in nitrate levels after topical treatment with SB204.

75. On January 17, 2017, the Company announced entry into an exclusive license agreement with Sato Pharmaceutical Co., Ltd., a Japanese company, for the exclusive rights to develop and commercialize SB204 in Japan. The announcement stated, in relevant part:

"We are pleased to announce this agreement with Sato," said Nathan Stasko, PhD, President and Chief Executive Officer of Novan. "Sato has established a strong position in the Japanese dermatology market. This new partnership, coupled with Sato's market-leading position in topical acne care with Dalacin T® and recent launch of Luconac® for onychomycosis, clearly illustrates Sato's commitment to improving the quality of life of patients with skin diseases. We believe this deal underscores the potential of SB204 as a truly first-in-class monotherapy for the treatment of acne and is consistent with Novan's strategy to remain focused on commercializing our product candidates in the United States while establishing partnerships to unleash

- 23 -

nitric oxide's therapeutic potential worldwide. We look forward to a long and prosperous partnership with our friends at Sato."

The SB204 development program includes two completed Phase 2 studies, in which topical application of a nitric oxide-releasing gel has demonstrated statistically significant percent reductions in acne lesions, the primary efficacy analyses required for recent topical acne drugs approved by Japan's Ministry of Health, Labor and Welfare. Additionally, the favorable tolerability profile of SB204 is a particularly attractive attribute for the Japanese patient population that has experienced a greater incidence of skin irritation with retinoid and benzoyl peroxide therapies than the U.S. population.

76.     During the Class Period, the price of Novan stock climbed significantly from the IPO price, reaching as high as $29.09 on December 7, 2016.

77.     Before the market opened on January 27, 2017, Novan announced the top-line results of its two "identical" Phase 3 clinical trials of SB204. Although the drug hit all of its goals in one of the trials, dubbed NI-AC302, it failed to beat a placebo in the other separate Phase 3 study, called NI-AC301.

78.     On news of the discordant results in what were supposed to be two identical studies, the price of Novan stock dropped suddenly. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than 8 million shares.

79.     Before the market opened on March 6, 2017, the Company issued a release providing an update on SB204. The update told investors that after "further analysis of the results from the NI-AC301 and NI-AC302 pivotal clinical trials for the Company's topical nitric oxide-releasing product candidate, SB204, it intends to proceed with the SB204

- 24 -

development program." In a presentation that accompanied the release, the Company stated that the SB204 Phase 3 trials involved approximately "2,600 patients enrolled in two, identical studies across 110 sites in the US." The release and the presentation indicated to investors that the Company would have a "Pre-NDA Meeting" with the FDA in the third quarter of 2017 and that Novan remained committed to SB204 for the treatment of acne.

80. On March 20, 2017, the Company announced its fourth quarter and full year 2016 financial results. The release stated, in relevant part:

> Novan is currently evaluating a number of financing options, from non-dilutive partnership opportunities across the Company's pipeline to traditional private and public equity raises, to provide additional funding that will be required to support development of SB204 through the FDA process, including the cost of an additional well-controlled trial, and to fund operations for platform programs beyond 2017, including the cost of two Phase 3 pivotal clinical trials of SB206.

> "We are pleased to announce the results of Novan's first year-end as a public company," said Nathan Stasko, Ph.D., President and Chief Executive Officer of Novan. "This past year we were able to complete our IPO in extremely challenging market conditions and meaningfully increased our drug development infrastructure. As a result, we were able to advance our nitric oxide platform by initiating our Phase 3 clinical program for SB204, completing our Phase 2 clinical trial for SB206, commencing our Phase 2 proof-of-concept trial for SB208 and generating preclinical data that encourages us to accelerate clinical development of our SB414 candidate for inflammatory skin diseases. As we look ahead into 2017, we are eager to expand upon the budding knowledge of nitric oxide's role in dermatological diseases and to provide new evidence to support advancing each of our pipeline candidates. In the second quarter alone, we expect to hold our SB206 end-of-Phase 2 meeting with the U.S. Food and Drug Administration, or FDA, release top-line results of our SB208 anti-fungal Phase 2 trial and submit our Investigational New Drug application, or IND, for SB414 as a potential treatment for patients with mild to moderate psoriasis. Each of these clinical-stage candidates may provide non-dilutive financing opportunities as we look to expand upon our number of industry collaborations. Additionally, we look forward to our pre-submission meeting with the FDA for SB204 and

continuing toward our goal of developing and launching the first new chemical entity approved for the treatment of acne in over 20 years."

*       *       *

Novan intends to pursue a pre-submission meeting with the FDA to discuss the entirety of the SB204 development program in the third quarter of 2017, which could lead to a new drug application, or NDA, submission in the first quarter of 2018, assuming among other things successful completion of the Company's ongoing long-term safety study. Following the pre-NDA meeting, Novan expects to finalize plans for an additional well-controlled clinical trial with SB204 to be conducted in parallel with the FDA review to support NDA approval.

81.    In its annual report for fiscal 2016 filed with the SEC on March 20, 2017 ("2016 10-K"), the Company told investors that the two "*identical*" clinical trials for SB204 included *different* patient populations. Specifically, the 2016 10-K stated "[w]e believe the inclusion of these 14 patients on birth control, 8 in the SB204 arm of the trial and 6 in the vehicle arm, contributed to the reduced separation from vehicle in the NI-AC301 trial observed for inflammatory lesions in our primary analysis." It also stated that "[t]he FDA had encouraged us, *as part of our discussions regarding an SPA*, to evaluate treatment effectiveness in women on oral contraceptive prescriptions with an acne indication." The 2016 10-K added, "Whether or not this subset of patients will be included in future trials is still to be determined." The Company's SPA discussions with the FDA, however, occurred *prior to* Novan's IPO, and none of Defendants' statements prior to the 2016 10-K disclosed that the FDA had advised Novan to include a unique patient population in one of the "identical" Phase 3 clinical trials for SB204.

- 26 -

82. After revealing that the two Phase 3 clinical trials for SB204 were not identical, on March 22, 2017, the Company announced "adjustments to the executive management team." Specifically, Novan announced that CFO Peterson was "leaving to pursue other business interests" and would be replaced, "effective immediately," by interim CFO Hodges. The release also stated that Novan was creating a new executive position of Chief Development Officer ("CDO") to oversee "the tactical execution of clinical trials and the establishment of statistics and data management functions at the Company." The Company indicated the new CDO would "team with Dr. Joyce Rico, Chief Medical Officer, as Novan prepares for upcoming interactions with the . . . FDA, including the planned pre-submission meeting regarding a potential new drug application for SB204."

83. On April 4, 2017, the Company announced formation of a new "Advisory Council" comprised of "key opinion leaders with broad expertise in dermatology" to "provide medical advice and drug-development insight to the Company's senior leadership team and board of directors."

84. On May 5, 2017, Novan filed an 8-K with the SEC, signed by interim CFO Hodges, disclosing that the Company's CMO, Rico, had resigned for "Good Reason" as defined in her less than one-year-old employment agreement with Novan dated August 25, 2016.

85. On May 12, 2017, the Company filed with the SEC on Form 10-Q its quarterly report for the first quarter ended March 31, 2017 ("1Q17 10-Q"). The 1Q17 10-Q included a "going concern" warning, stating:

The Company has concluded that these conditions raise substantial doubt about the Company's ability to continue as a going concern within one year from the date that these financial statements are issued. To mitigate these conditions, the Company needs and intends to raise additional funds through equity or debt financings or generate revenues from collaborative partners prior to the commercialization of the Company's product candidates. There can be no assurance that the Company will be able to obtain additional debt or equity financing or generate revenues from collaborative partners, on terms acceptable to the Company, on a timely basis or at all. The failure of the Company to obtain sufficient funds on acceptable terms when needed could cause the Company to alter or reduce its planned operating activities, including but not limited to delaying planned product candidate development activities, to conserve its cash and cash equivalents. Such actions could delay development timelines and have a material adverse effect on the Company's results of operations and financial condition. Additionally, there is no assurance that the Company can achieve its development milestones or that its intellectual property rights will not be challenged.

86.     Regarding SB204, the 1Q17 10-Q stated, in relevant part:

We expect that one additional Phase 3 trial may be necessary to support FDA approval of SB204. We are currently assessing trial design enhancements. We are also assessing cost, financial priorities and probabilities of success to determine if and when we will conduct this additional trial.

87.     Then, on June 5, 2017, Novan announced that it was replacing CEO and co-founder Stasko with Martin, a member of the Company's Board, who would become interim CEO, and that Stasko would become the Company's President and Chief Scientific Officer. The Company also announced on June 5, 2017 that it was laying off 20% of its workforce and that despite previously assuring investors that it was committed to SB204, the Company was now executing a plan to turn its focus to earlier-stage compounds that could have applications as topical treatments for inflammatory skin conditions, such as psoriasis and eczema. Specifically, the June 5, 2017 release stated, in relevant part:

- 28 -

*Given our near term business focus on executing less resource intensive phase 2 trials in psoriasis and atopic dermatitis*, and the need to be disciplined with regard to cash utilization, the Company has reduced its overall headcount by approximately 20%. This action will accomplish three things: reduce near term operating costs and preserve cash on our balance sheet, enable refined focus around key projects, and align necessary skills to near term tasks and activities. The Company will continue to evaluate the component parts of the business and adjust resources up or down as needed. Novan continues to believe that the Company's cash on hand is sufficient to fund operations at least through the end of 2017.

Balance sheet focus and sequence:

To be exceedingly clear, the Company will require additional capital in order to proceed on broadening the potential application of the science (nitric oxide) and the underlying technology, and specifically to initiate and complete the planned phase 2 trials in both psoriasis and atopic dermatitis. Additional regulatory clarity surrounding SB204 for acne, as well as both SB206 and SB208, will provide important financial and strategic options as to how the Company strengthens its balance sheet and actively manages other financial considerations.

88.     In response to the Company's June 5, 2017 disclosures, the price of Novan stock dropped 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling an additional 4% to close at $4.45 on June 6, 2017.

89.     On August 2, 2017, the Company hosted a webcast to provide an overall update on Novan. During the webcast, the Company stated it had over $19 million of cash as of June 30, 2017, and that "[s]trengthening of the balance sheet is a near-term goal to enable an increase in operating runway." The webcast also stated that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity."

90.     Following the webcast, the price of Novan stock declined from $5.48 on August 1, 2017 to $4.54 on August 2, 2017, a decline of more than 17%.

91.     The statements referenced in ¶¶47-52 and ¶¶73-74 were materially false and misleading because they:

(a)     falsely described the two Phase 3 clinical trials for SB204, NI-AC301, and NI-AC302, as "identical," when, in fact, one of the trials included a specific patient population – women on oral contraceptive prescriptions – that was not present in the other clinical trial;

(b)     omitted disclosure of key aspects of the Company's business, specifically distinctions within the Company's SB204 product and Phase 3 clinical tests that were requested by the FDA, which undermined the likelihood that SB204 would achieve its study endpoints;

(c)     omitted that the FDA had encouraged Novan, as part of its discussions regarding the SPA for the Phase 3 trials, to evaluate treatment effectiveness of SB204 in women on oral contraceptive prescriptions, such as Yaz or Ortho-Tricyclen, and that the inclusion of such women in one of the SB204 trials, but not the other, was likely to impact the Phase 3 clinical trial results;

(d)     omitted information regarding SB204, leaving investors unable to accurately assess the validity of Defendants' statements regarding the status of SB204 and its potential for commercialization; and

(e)     as a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

## ADDITIONAL SCIENTER ALLEGATIONS

92.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Novan, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Novan, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

93.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Novan stock and operated as a fraud or deceit on Class Period purchasers of Novan stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market

through a partial disclosure, the price of Novan stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Novan stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Novan was revealed through the several disclosures specified herein, which removed the artificial inflation from the price of Novan common stock.

94. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Novan's business and prospects. Defendants' false and misleading statements had the intended effect and caused Novan stock to trade at artificially inflated levels throughout the Class Period.

95. As a direct result of the disclosures identified herein, the price of Novan stock fell precipitously. This removed the artificial inflation from the price of Novan stock, causing real economic loss to investors who had purchased Novan stock at artificially inflated prices during the Class Period.

96. The price declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through several partial disclosures. The timing and magnitude of the price declines in Novan stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially

inflate the price of Novan stock and the subsequent significant decline in the value of Novan stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

97. At all relevant times, the market for Novan stock was an efficient market for the following reasons, among others:

(a) Novan stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Novan filed periodic public reports with the SEC;

(c) Novan regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Novan was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

98. As a result of the foregoing, the market for Novan stock promptly digested current information regarding Novan from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Novan

stock during the Class Period suffered similar injury through their purchase of Novan stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

99.     The "Safe Harbor" warnings accompanying Novan's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

100.    Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Novan who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT III

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Novan and the Individual Defendants

101.    Plaintiff incorporates ¶¶72-100 by reference.

- 34 -

102. During the Class Period, Novan and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103. Novan and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Novan stock during the Class Period.

104. In addition to the duties of full disclosure imposed on Novan and the Individual Defendants as a result of their affirmative false and misleading statements to the public, they had a duty to promptly disseminate truthful information with respect to Novan's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to SB204, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

105.   As a direct and proximate result of Novan and the Individual Defendants'

wrongful conduct, Plaintiff and the Class have suffered damages in connection with their

respective purchases and sales of Novan stock during the Class Period, because, in reliance

on the integrity of the market, they paid artificially inflated prices for Novan stock and

experienced loses when the artificial inflation was released from Novan stock as a result of

the partial revelations and stock price decline detailed herein.  Plaintiff and the Class would

not have purchased Novan stock at the prices they paid, or at all, if they had been aware that

the market prices had been artificially and falsely inflated by Novan and the Individual

Defendants' misleading statements.

106.   By virtue of the foregoing, Novan and the Individual Defendants have each

violated Section 10b of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### Against Novan, Stasko, and Peterson

107.   Plaintiff incorporates ¶¶72-100 by reference.

108.   Defendants Stasko and Peterson acted as controlling persons of Novan within

the meaning of Section 20(a) of the Exchange Act.  By reason of their controlling positions

with the Company, and their ownership of Novan common stock, Stasko and Peterson had

the power and authority to cause Novan to engage in the wrongful conduct complained of

herein.  Novan controlled Stasko, Peterson, and all of its employees.  By reason of such

conduct, Novan, Stasko, and Peterson are liable pursuant to Section 20(a) of the Exchange

Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 3, 2017                    McDANIEL & ANDERSON, L.L.P.
                                                                L. BRUCE McDANIEL (NC State Bar No. 5025)


                                                                _/s/ L. Bruce McDaniel_
                                                                L. BRUCE McDANIEL

                                                                Lafayette Square
                                                                4942 Windy Hill Drive
                                                                Raleigh, NC  27609
                                                                Telephone:  919/872-3000
                                                                919/790-9273 (fax)
                                                                mcdas@mcdas.com

- 37 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone:  770/200-3104
770/200-3101 (fax)
michaelf@johnsonfistel.com

Attorneys for Plaintiff

### CERTIFICATION OF PLAINTIFF PURSUANT
### TO THE FEDERAL SECURITIES LAWS

I, Victor Miriyala, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 01/17/2017 | 300 | $22.96 |
| 01/25/2017 | 300 | $17.70 |
| No new buys. | | |

**Sales:**

| Sold on 05/18/2017   600 stock at price $4.79 per share |
|---|

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

DocuSign Envelope ID: 49A98C86-A882-4AEA-B5B8-55C5DD5D02AC

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of September, 2017.



Victor Miriyala