UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN RE NOVAN, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | ) | Lead Case No. 1:17-cv-00999-CCE-JEP<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u><br><br>Judge Catherine C. Eagles<br><br>CONSOLIDATED AMENDED COMPLAINT |

## Table of Contents


**Page**

I. NATURE OF THE ACTION ....1

II. JURISDICTION AND VENUE ....4

III. CLASS ACTION ALLEGATIONS ....5

IV. VIOLATIONS OF THE SECURITIES ACT ....7

A. The Securities Act Parties ....8

1. The Securities Act Plaintiff ....8

2. The Securities Act Defendants ....8

a. Novan and Individual Defendants ....8

b. Director Defendants ....9

c. Underwriter Defendants ....10

B. Novan Conducts the Initial Public Offering ....12

C. The Securities Act Defendants' Untrue and Misleading Statements and Omissions of Material Fact ....12

D. The Offering Documents Omitted Information Required to Be Disclosed Under Items 303 and 503 of Regulation S-K ....16

COUNT I ....18

For Violations of Section 11 of the Securities Act Against the Securities Act Defendants ....18

COUNT II ....20

For Violations of Section 15 of the Securities Act Against Novan, the Individual Defendants, and the Director Defendants ....20

V. VIOLATIONS OF THE EXCHANGE ACT ....20

A. The Exchange Act Parties ....21

1. The Exchange Act Plaintiff ....21

2. The Exchange Act Defendants....21

B. Substantive Allegations....22

1. Background of the Company and SB204....22

2. FDA Regulation of New Drugs....23

3. At the Time of the Initial Public Offering, Novan Had Completed Its Phase 2 Clinical Trials on SB204....25

a. Phase 2a Trial....25

b. Phase 2b Trial....27

4. Novan and the FDA Met Prior to the Start of Its Two "Identically Designed" Phase 3 Trials....29

5. During the Class Period, the Exchange Act Defendants Repeatedly Stressed that Novan Was Conducting Two "Identically Designed" Phase 3 Trials on SB204....30

6. The Exchange Act Defendants Concealed that the Phase 3 Trials Had Material Differences....32

a. The Exchange Act Defendants Purposefully Included Other FDA-Approved Acne Medications in NI-AC301, but Not in NI-AC302....32

b. The Exchange Act Defendants Concealed that They Used an Insufficient Sample Size to Study the Interaction Between SB204 and FDA-Approved Acne Medications....35

c. The Exchange Act Defendants Concealed that the Participants in NI-AC301 Had More Severe Acne than the Participants in NI-AC302....37

7. The Exchange Act Defendants Reveal Materially Discrepant Results for the Purportedly "Identical" Phase 3 Trials....39

8. The Exchange Act Defendants Further Reveal the Truth Regarding the Material Difference Between the Two Phase 3 Trials for SB204....40

C. The Exchange Act Defendants' False and Misleading Statements and Omissions....42

D. The Truth Emerges....45

E. Post-Class Period Revelations Concerning the Negative Effects that the Misleading Statements and Omissions Regarding the Phase 3 Trials Had Caused for SB204's Approval Timeline and Novan's Operations ........................47

F. Additional Scienter Allegations ..............................................................51

G. Loss Causation and Economic Loss ......................................................53

H. Presumption of Reliance ..........................................................................55

I. No Safe Harbor ............................................................................................58

COUNT III: ..........................................................................................................58

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Exchange Act Defendants ..........................................................................58

COUNT IV: ..........................................................................................................60

For Violations of Section 20(a) of the Exchange Act Against the Exchange Act Defendants ..........................................................................................60

PRAYER FOR RELIEF ......................................................................................61

JURY DEMAND ....................................................................................................62

Lead Plaintiff Van Phan ("Plaintiff"), by and through Plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and based on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, announcements, and United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Novan, Inc. ("Novan" or "Company"); analysts' reports, advisories about the Company, investigation of factual sources, including individuals formerly employed by the Company, and information readily obtainable on the Internet. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class ("Class") consisting of all persons other than Defendants who purchased or otherwise acquired Novan stock: (a) pursuant and/or traceable to Novan's false and misleading Registration Statement and Prospectus, issued in connection with the Company's initial public offering on or about September 21, 2016 ("IPO"); and/or (b) on the open market between September 21, 2016 and January 26, 2017, inclusive ("Class Period"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2. Novan is a clinical-stage drug development company that focuses on the development and commercialization of nitric oxide-based therapies in dermatology. Novan was incorporated in January 2006 under the laws of Delaware and its subsidiaries were organized in May 2015 under the laws of North Carolina.

3. Before and during the Class Period, Defendants represented that Novan had commenced two ***identically designed*** Phase 3 clinical trials of SB204 ("Phase 3 Trials"), a once-daily, nitric oxide-based topical gel for the treatment of acne vulgaris. SB204 was the Company's lead product candidate, and information regarding its development and commercialization was important to the financial performance of the Company, the viability of its nitric oxide-based product candidates, and investors in Novan.

4. In the Company's IPO documents (the Registration Statement and Prospectus are collectively the "Offering Documents") and throughout the Class Period, Defendants made materially false and misleading statements and omitted material information regarding the Company's business and outlook, specifically regarding SB204. For example, Defendants repeatedly stated that Novan had commenced and performed two ***identically designed*** Phase 3 clinical trials of SB204. Defendants' statements were false because they omitted specific, important facts as to why the Phase 3 Trials were, in fact, not identical. As a result of these false statements and omissions, the Company's outlook and expected financial performance, as well as SB204's prospects and status, were not accurately represented to the market.

5. During the Class Period, the price of Novan stock climbed significantly above the IPO price of $11.00 per share, reaching as high as $29.09 on December 7, 2016.

6. Before the market opened on January 27, 2017, Novan announced the top-line results of its two "identical" Phase 3 Trials of SB204. Although the drug hit all of its goals in one of the

trials, dubbed NI-AC302, it failed to beat a placebo in the other separate Phase 3 trial, called NI-AC301. This news revealed that the Phase 3 Trials were not only not identical, but contained important distinctions that materially impacted their ability to meet their endpoints.

7. On news of the discordant results in what were described to be two identical studies, the price of Novan stock dropped significantly. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than eight million shares.

8. Post-Class Period disclosures regarding SB204 demonstrated that the Phase 3 Trials of SB204 were not "identical" but instead had material differences that led to the diverging results. Novan included in NI-AC301 women with acne who were taking oral contraceptives with an acne indication (*i.e.*, designed to also treat acne), such as drospirenone (sold in the United States as Yasmin or "Yaz") and Ortho Tri-Cyclen. Notably, Yaz and Ortho-Tri-Cyclen are both Food and Drug Administration ("FDA") approved acne medications. NI-AC302, however, did not include women on oral contraceptives with an acne indication. *Ex post facto* disclosures by Novan make clear that Novan included women on oral contraceptive, FDA-approved acne medications in its Phase 3 Trials for SB204 because of direct conversations with the FDA that occurred prior to the IPO. The Offering Documents omitted this information.

9. Another significant difference between the two Phase 3 Trials was that participants in NI-AC301 began with significantly more severe acne than those in NI-AC302. This undisclosed difference was an additional reason that the Phase 3 Trials were not "identical," and resulted in NI-AC301's failure.

10. Following these disclosures, several executives left the Company. On March 22, 2017, Novan announced that its Chief Financial Officer ("CFO"), Defendant Richard D. Peterson

("Peterson"), was leaving and would be replaced, "effective immediately," by interim CFO William L. Hodges ("Hodges"). On May 5, 2017, Novan disclosed that the Company's Chief Medical Officer ("CMO"), M. Joyce Rico ("Rico"), had resigned. Then, on June 5, 2017, Novan announced that it was replacing its Chief Executive Officer ("CEO") and co-founder, Defendant Nathan Stasko, Ph.D. ("Stasko"), with Defendant G. Kelly Martin ("Martin"), a member of the Company's Board of Directors ("Board"), who would become interim CEO. Novan also announced that it was laying off 20% of its workforce and that despite previously assuring investors that it was committed to SB204, Novan was executing a plan to turn its focus to earlier-stage compounds.

11. Following the Company's June 5, 2017 disclosures, the price of Novan stock fell 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling 4% to close at $4.45.

12. Additional disclosures on August 2, 2017 informed the market that Novan would be retreating further from SB204, stating that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity." On this news, the price of Novan stock declined from $5.48 on August 1, 2017, to $4.54 on August 2, 2017, a drop of more than 17%.

13. As a result of Defendants' wrongful acts and omissions described herein, and the significant declines in the market value of Novan stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

16. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District. Novan's headquarters are located in this District at 4105 Hopson Road, Morrisville, North Carolina 27560.

17. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Novan stock during the Class Period, including: (a) all persons or entities who acquired Novan stock pursuant and/or traceable to the IPO; and (b) all persons who purchased Novan stock on the open market during the Class Period. Excluded from the Class are all Defendants and their families; the officers and directors of the Company, at all relevant times; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

19. Members of the Class are so numerous that joinder of all members is impracticable. Novan issued 4.1 million shares in the IPO. Novan trades on the NASDAQ and, as of March 17, 2017, had more than 15 million shares of common stock outstanding. While the exact number of

Class members can only be determined by appropriate discovery, Plaintiff believes that the Class members number at least in the thousands, and that they are geographically dispersed.

20. Plaintiff's claims are typical of the members of the Class because Plaintiff and all Class members sustained damages arising from Defendants' wrongful conduct complained of herein.

21. Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

23. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

(a) whether Defendants violated the Securities Act and the Exchange Act;

(b) whether the Offering Documents contained or incorporated material misrepresentations;

(c) whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about Novan;

(d) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) whether – as to the Exchange Act claims only – Defendants knew or recklessly disregarded that their statements were false and misleading;

(f) whether – as to the Exchange Act claims only – the price of Novan stock was artificially inflated; and

(g) the extent of damages sustained by Plaintiff and the other Class members and the appropriate measure of damages.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

## IV. VIOLATIONS OF THE SECURITIES ACT

25. The claims addressed in this section (Counts I and II, below) are brought pursuant to Sections 11 and 15 of the Securities Act. Count I is brought against all Securities Act Defendants and Count II is brought against Novan, the Individual Defendants, and the Director Defendants (defined in Section IV.A.2., below). These claims are, in effect, a separate complaint. In the allegations and claims set forth herein, Plaintiff asserts strict liability claims pursuant to the Securities Act on behalf of itself and the Class. Plaintiff's claims are not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any of the Securities Act Defendants. Plaintiff's claims do not, and are not intended to, allege fraud or sound in fraud, and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A. The Securities Act Parties

#### 1. The Securities Act Plaintiff

26. Lead Plaintiff Van Phan, as set forth in Plaintiff's Certification attached hereto and incorporated by reference herein, purchased Novan shares at artificially inflated prices during the Class Period and suffered damages as a result of the conduct alleged herein.

#### 2. The Securities Act Defendants

##### a. Novan and Individual Defendants

27. Defendant Novan, Inc. is incorporated in Delaware and has its headquarters in this District. Shares of Novan stock trade on the NASDAQ under the ticker symbol "NOVN."

28. Defendant Nathan Stasko, Ph.D. was the President and CEO of Novan, and is also a member of Novan's Board. Defendant Stasko is the inventor of Novan's core technology and is responsible for more than 100 patent filings, 19 of which have been issued. Defendant Stasko has also authored several peer-reviewed manuscripts pertaining to chemical storage and the release of nitric oxide. Defendant Stasko led Novan during its development of SB204, including prior to and at the time of the IPO. Defendant Stasko was replaced as CEO on June 5, 2017, but remained with the Company. Defendant Stasko signed the Registration Statement used in connection with the IPO.

29. Defendant Richard D. Peterson was Novan's CFO from September 2015 until the Company announced he was replaced, effective immediately, on March 22, 2017, by Hodges as interim CFO while Novan searched for a permanent replacement. Defendant Peterson has more than 20 years of experience in executive management, finance, and accounting. Defendant Peterson signed the Registration Statement used in connection with the IPO.

30. Defendants Stasko and Peterson (collectively, the "Individual Defendants") participated in the drafting, preparation, and/or approval of various untrue and false statements

contained or incorporated in the Offering Documents used in connection with the IPO. Defendants Stasko and Peterson signed the Registration Statement and had a duty to ensure the truthfulness and accuracy of the various statements contained and incorporated therein, and to ensure there were no omissions of material fact that would make the statements in the Registration Statement and materials incorporated therein inaccurate.

**b. Director Defendants**

31. Defendant Robert A. Ingram ("Ingram") is a member of Novan's Board and was named Chairman in February 2016. Defendant Ingram signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Ingram's behalf.

32. Defendant W. Kent Geer ("Geer") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Geer's behalf.

33. Defendant Robert J. Keegan ("Keegan") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Keegan's behalf.

34. Defendant G. Kelly Martin is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Martin's behalf.

35. Defendant Sean Murphy ("Murphy") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Murphy's behalf.

36. Defendant John W. Palmour, Ph.D. ("Palmour") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Defendant Stasko using his power-of-attorney to sign on Defendant Palmour's behalf.

37. The Defendants named in ¶¶31-36 are collectively referred to herein as the "Director Defendants."

38. The Director Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Documents. Each Director Defendant signed the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### c. Underwriter Defendants

39. Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and asset management firm located in Minneapolis, Minnesota that offers financial advisory and securities brokerage services. Piper Jaffray acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO.

40. Defendant JMP Securities LLC ("JMP Securities") is a subsidiary of JMP Group LLC, a full service investment bank and asset management firm that provides investment banking, sale and trading, and equity research services to corporate and institutional clients. JMP Securities acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO.

41. Defendant Wedbush Securities Inc. ("Wedbush") is one of the largest securities firms and investment banks in the United Sates. Wedbush acted as an underwriter of the IPO, helping to draft and disseminate the Offering Documents used in connection with the IPO. Wedbush initiated

coverage of Novan on October 17, 2016, with a price target of $27 and a stock rating of "outperform."

42. The Defendants named in ¶¶39-41 are collectively referred to as the "Underwriter Defendants."

43. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements and omissions in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking firms that specialize in writing public offerings of securities. Prior to the IPO, certain of the Underwriter Defendants, and representatives from Novan, met with potential investors and presented highly favorable information about the Company, its operations, and SB204;

(b) The Underwriter Defendants obtained an agreement from Novan that Novan would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws;

(c) Representatives of the Underwriter Defendants also assisted Novan and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Novan, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their due diligence, the Underwriter Defendants had the opportunity to obtain access to confidential corporate information concerning Novan's operations and financial prospects, but failed to perform adequate due diligence in connection with their roles and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately, and free from misstatements or omissions of material fact. The Underwriter Defendants'

failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein;

(d) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective; and

(e) The Underwriter Defendants collectively received discounts and commissions of approximately $3,630,550 in connection with the IPO. In addition, Novan granted the Underwriter Defendants an option to purchase up to an additional 615,000 shares of common stock at the IPO price, less the underwriting discount, for a period of 30 days after the IPO.

**B. Novan Conducts the Initial Public Offering**

44. On August 24, 2016, Novan filed a Registration Statement on Form S-1 with the SEC. An amended Registration Statement was filed on September 8, 2016, and a second amended Registration Statement was filed on September 20, 2016. On September 20, 2016, the SEC declared the Registration Statement effective, pursuant to which the Company offered 4,100,000 shares of its common stock for $11.00 each. The Prospectus was filed with the SEC on September 22, 2016.

45. The Company sold an aggregate of 4,715,000 shares of common stock under the Registration Statement declared effective by the SEC on September 20, 2016, at a public offering price of $11 per share, for aggregate proceeds of $51,865,000. After deducting underwriter discounts and commissions, net proceeds to the Company were $44,595,000. In connection with the IPO, the Company granted the Underwriter Defendants a 30-day option to purchase up to an additional 615,000 common shares at the IPO price less underwriting discounts and commissions.

**C. The Securities Act Defendants' Untrue and Misleading Statements and Omissions of Material Fact**

46. The Offering Documents, which include the Prospectus, Registration Statement, and the exhibits to the Registration Statement, described Novan's business, described the nature of each

of its products, set forth its historical financial data, described the Company's lead product candidate SB204, and provided the terms of the IPO. The Registration Statement was signed by the Individual Defendants and the Director Defendants.

47. The Registration Statement described Novan's lead product candidate SB204 and its treatment of acne vulgaris, and stated, "***We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017***." In discussing the Phase 3 Trials, the Registration Statement stated, "***We designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015***." The Registration Statement further stated that "***[a]ssuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our NDA for SB204 to the FDA by the end of 2017***."[1]

48. Discussing the Company's business strategy for SB204, the Registration Statement stated that Novan planned to:

> Complete development of our late-stage product candidate, SB204 and submit for regulatory approval in the United States. ***In the first quarter of 2016, we initiated two identically designed Phase 3 pivotal clinical trials for our lead product candidate, SB204 to treat acne vulgaris, and we expect to report top-line results in the first quarter of 2017. These trials are designed to further evaluate the safety and efficacy of SB204 in 2,600 patients with acne vulgaris. Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submitting our NDA to the FDA for SB204 by the end of 2017.***

49. The Registration Statement explained that Novan "***completed an end-of-Phase 2 meeting with the FDA and submitted the protocols for the Phase 3 program under a special***

[1] A new drug application ("NDA") is the process by which drug sponsors propose new drugs to the FDA.

***protocol assessment, or SPA, for review by the FDA***."[2] As a result of Novan's end-of-Phase 2 meetings and communications with the FDA regarding SB204, the Registration Statement added, "***We have reached agreement with the FDA on the primary endpoints for our Phase 3 clinical trials, but do not intend to pursue a full formal SPA agreement with the FDA***."

50. The Prospectus added similar information regarding the Phase 3 Trials, stating, "***We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017***." Specifically, it included statements regarding the Company's discussions with the FDA over the Phase 3 clinical trial design for SB204 and explained that the Company did not have an SPA from the FDA even though it made a previous submission "in connection with the design of [the] Phase 3 clinical trials for SB204." The Prospectus stated, "***We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA***." It continued, in relevant part:

> ***We recognize that the feedback obtained in connection with the SPA discussions does not constitute a formal SPA or a binding declaration from the FDA that it agrees with the Phase 3 clinical trials' design, clinical endpoints or statistical analysis plan.*** We may, in the future, decide to make a submission for an SPA for any of our current or future product candidates.

51. The Offering Documents, including the materials incorporated therein by reference, were negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading at the time they were made, and were not prepared in accordance with the rules and regulations governing their preparation. The Offering Documents:

[2] An SPA is designed to facilitate the FDA's review and approval of drugs by allowing the FDA to evaluate, in part, the proposed design and size of the Phase 3 clinical trials that are intended to form the primary basis for determining efficacy.

(a) falsely described the Phase 3 Trials for SB204, NI-AC301 and NI-AC302, as "identical," when, in fact, NI-AC301 included a specific patient population – women on oral contraceptive prescriptions with an acne indication – that was not present in NI-AC302;

(b) omitted disclosure of key distinctions between each of the Company's two SB204 Phase 3 Trials affecting the likelihood that SB204 would achieve its endpoints;

(c) omitted that the FDA had encouraged Novan, as part of its discussions regarding the SPA for the Phase 3 Trials, to evaluate treatment and separately report effectiveness of SB204 in women who were already on FDA-approved acne medications, specifically oral contraceptive prescriptions such as Yaz or Ortho-Tricyclen, and that the inclusion of such women in NI-AC301, but not NI-AC302, was likely to impact the Phase 3 clinical trial results;

(d) omitted that of the 2,633[3] participants in the Phase 3 Trials, only 14 women – amounting to only 0.5% of the total SB204 Phase 3 participants – were women on oral contraceptives with an acne indication, indicating that Novan specifically selected these 14 women and deliberately placed them in NI-AC301, rendering the two Phase 3 Trials not identical;

(e) omitted that the inclusion of women on oral contraceptives that doubled as FDA-approved acne medication contradicted the enrollment criteria on the official Phase 3 Trial website, which stated that participants must be willing to "***not*** use any other acne treatment during the study";[4]

---

[3] According to the results released by Novan, 2,637 participants enrolled in the Phase 3 Trials, but 4 of those participants (1 in NI-AC301 and 3 in NI-AC302) were excluded from the results because the "study drug [was] not dispensed." Accordingly, the Phase 3 Studies included a total of 2,633 participants.

[4] *See* Novan, Inclusion/Exclusion Parameters, http://acnetrials.com/inclusionexclusion-parameters/ (last visited Apr. 26, 2018).

(f) omitted that there was a statistically significant difference between the baseline Investor Global Assessment ("IGA") scores for NI-AC301 and NI-AC302, which established that participants in NI-AC301 had significantly higher baseline IGA scores (*i.e.*, more severe acne), rendering it less likely that NI-AC301 could meet its third primary endpoint;[5]

(g) omitted information regarding SB204, leaving investors unable to accurately assess the validity of the Securities Act Defendants' statements regarding the status of SB204, its likelihood of FDA approval, its potential for commercialization and the timing thereof, and the likely financial impact SB204 would have on the Company following conclusion of the Phase 3 Trial; and

(h) as a result of the foregoing, the Securities Act Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

## D. The Offering Documents Omitted Information Required to Be Disclosed Under Items 303 and 503 of Regulation S-K

52. The Offering Documents and the Securities Act Defendants' statements omitted material information required by Item 303 of Regulation S-K. Item 303 requires the disclosure of all "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." In addition to the identification of such "known trends," Item 303 specifically requires disclosure of: (a) whether those trends have had or are reasonably expected to have a material negative impact on revenue; and (b) the extent of any such impact on revenue.

---

5 The IGA required the study administrators to determine where each participant's acne fit on the following scale: 0 (clear), 1 (almost clear), 2 (mild severity); 3 (moderate severity); 4 (severe). The study administrators assigned IGA scores to each participant at the beginning and end of the trials, and then those scores were compared. One of the goals of the Phase 3 Trials (*i.e.*, the third primary endpoint) was for the SB204 arm to show IGA score improvements that exceeded – to a statistically significant degree – improvements over the control arm.

53. Accordingly, the SEC has repeatedly emphasized that the "specific provisions in Item 303 require disclosure of forward-looking information." *See Management's Discussion & Analysis of Financial Condition & Results of Operations; Certain Investment Company Disclosures*, S.E.C. Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future." *Id.* Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Commission Guidance Regarding Management's Discussion & Analysis of Financial Condition & Results of Operations*, S.E.C. Release No. 8350, 81 S.E.C. Docket 2905, 2003 WL 22996757, at *11 (Dec. 19, 2003) (footnote omitted).

54. Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operation." *See Management's Discussion*, 1989 WL 1092885, at *4.

55. Accordingly, the omission of facts regarding SB204's Phase 3 Trials constitutes a violation of Item 303 and renders the Offering Documents and the Securities Act Defendants' other statements materially false and misleading.

56. Likewise, the Offering Documents failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made the

IPO speculative or risky to investors was the fact that, at the time of the IPO, the Company was not disclosing important facts regarding SB204 and the Phase 3 Trials that were underway.

**COUNT I**

**For Violations of Section 11 of the Securities Act Against the Securities Act Defendants**

57. Plaintiff incorporates ¶¶1-56 as though fully set forth herein. With respect to this Count, Plaintiff excludes any and all allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

58. This Count is brought against the Securities Act Defendants pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the other members of the Class who purchased Novan stock in and/or traceable to the Company's IPO.

59. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, and omitted facts necessary to make the statements made therein not misleading.

60. Novan was the registrant for the IPO. As the issuer of its common stock, Novan is strictly liable to Plaintiff and the Class for the materially inaccurate statements in the Offering Documents and for the failure of the Offering Documents to be complete and to disclose the material information required pursuant to the regulations governing its preparation.

61. The Individual Defendants and Director Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Defendants and Director Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They also had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Offering Documents inaccurate. By virtue of

the Individual Defendants' and Directors Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such the Individual Defendants and Director Defendants are strictly liable to Plaintiff and the Class.

62. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Plaintiff and the Class.

63. The Securities Act Defendants named herein were responsible for the contents and dissemination of the Offering Documents. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of material facts that rendered the statements misleading.

64. By reason of the conduct alleged herein, each of the Securities Act Defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

65. Plaintiff acquired Novan common stock pursuant and/or traceable to the IPO.

66. Plaintiff and the other members of the Class have sustained damages. The value of Novan stock has declined substantially subsequent to and due to the Securities Act Defendants' violations of the Securities Act.

67. At the time of their purchase of Novan stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year

has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Plaintiff commenced this action. Less than three years has elapsed between the time the shares upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

**COUNT II**

**For Violations of Section 15 of the Securities Act Against Novan, the Individual Defendants, and the Director Defendants**

68. Plaintiff incorporates ¶¶1-56 as though fully set forth herein.

69. This Count is brought pursuant to Section 15 of the Securities Act on behalf of Plaintiff and the other members of the Class against the Company, the Individual Defendants, and the Director Defendants.

70. Each of the Individual Defendants and Director Defendants were control persons of Novan by virtue of their positions as directors and/or senior officers of Novan. Each of the Individual Defendants and Director Defendants had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Novan. The Company controlled the Individual Defendants, the Director Defendants, and all of Novan's employees.

71. Each of the Individual Defendants and Director Defendants were culpable participants in the violations of Section 11 of the Securities Act alleged in the Count above, based on their having signed, or authorized the signing of, the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## V. VIOLATIONS OF THE EXCHANGE ACT

72. The claims addressed in this section (Counts III and IV, below) are brought against the Exchange Act Defendants, as defined below, pursuant to Sections 10(b) and/or 20(a) of the

Exchange Act, for making materially false and misleading statements and omissions that caused Plaintiff and other Class members to purchase Novan stock at artificially inflated prices and suffer damages when the artificial inflation was removed as a result of the disclosures alleged herein.

### A. The Exchange Act Parties

#### 1. The Exchange Act Plaintiff

73. Plaintiff Van Phan, as set forth in the Certification attached hereto and incorporated herein by reference, purchased Novan shares at artificially inflated prices during the Class Period and suffered damages as a result of the conduct alleged herein.

#### 2. The Exchange Act Defendants

74. Defendant Novan, Inc. is incorporated in Delaware and has its headquarters in this District. Shares of Novan stock trade on the NASDAQ under the ticker symbol "NOVN."

75. Defendant Nathan Stasko, Ph.D. was the President and CEO of Novan, and is also a member of Novan's Board. Defendant Stasko is the inventor of Novan's core technology and more than 100 patent filings, 19 of which have been issued. Defendant Stasko has also authored several peer-reviewed manuscripts pertaining to chemical storage and the release of nitric oxide. Defendant Stasko led Novan during its development of SB204, including prior to and at the time of the IPO. Defendant Stasko was replaced as CEO on June 5, 2017, but remained with the Company. Defendant Stasko signed the Registration Statement used in connection with the IPO.

76. Defendant Richard D. Peterson was Novan's CFO from September 2015 until he was replaced, effective immediately, on March 22, 2017, when the Company announced it would appoint Hodges as interim CFO and search for a permanent replacement. Defendant Peterson has more than 20 years of experience in executive management, finance, and accounting.

## B. Substantive Allegations

### 1. Background of the Company and SB204

77. Novan was founded in 2006 and describes itself as a late-stage pharmaceutical company focused on "redefining the standard of care in dermatology through the development and commercialization of innovative therapies using [Novan's] nitric oxide-releasing platform." According to Novan, nitric oxide plays a vital role in the natural immune system response against microbial pathogens, is an important regulator of inflammation, is one of the most researched molecules in human physiology, and has been extensively studied for microbial diseases and in the modulation of inflammation.

78. Nonetheless, nitric oxide-based products are scarce. Specifically, there is only one FDA-approved use of nitric oxide: nitric oxide gas for treatment of pulmonary hypertension in neonatal infants. Nitric oxide product scarcity is due to the historical challenges associated with developing safe and effective approaches for the chemical storage and controlled release of a gas for therapeutic applications. There are also significant limitations preventing storage of nitric oxide as a solid – rather than gas – and those limitations have prevented the creation of commercially viable nitric oxide products.

79. To address those problems, Novan developed proprietary technology allowing for the stable chemical storage of large amounts of nitric oxide in solid form, enabling a safe release and targeted delivery of nitric oxide to treat patients. Using that proprietary technology, Novan has focused on developing nitric oxide-based treatments for skin.

80. At all relevant times, the Company's lead product candidate was SB204, a once-daily, topical monotherapy to treat acne vulgaris. Acne vulgaris – the most common skin condition in the United States – affects 40-50 million Americans and ranges in severity from mild to severe cystic.

Severe cystic acne is most common during the teenage years and results from localized inflammation formed when oil ducts become clogged and rupture.

81. The Exchange Act Defendants stated that SB204 was developed in response to an unmet medical need for treating acne vulgaris. More specifically, they told investors that "innovation in medical dermatology has been largely stagnant for decades," with "the widespread use of antibiotics and retinoids to treat acne vulgaris [remaining] unchanged for over 30 years and … fail[ing] to balance efficacy, tolerability and growing concerns over antibiotic resistance in a single product." Furthermore, acne is a multifactorial disease with several contributors and, therefore, requires treatments that address more than one of the causes. To address those limitations, Novan sought to develop and gain FDA approval for SB204, which is designed to use localized nitric oxide delivery as a single active ingredient to provide anti-inflammatory and antibacterial treatment to patients suffering from acne vulgaris. Novan told investors its "nitric oxide platform is well suited to disrupt the large and growing dermatology market, reported to be $28 billion in the United States in 2014" and ultimately could "redefine the standard of care in dermatology."

**2. FDA Regulation of New Drugs**

82. The Federal Food, Drug & Cosmetic Act, enacted in 1938, created the FDA, an agency of the U.S. Department of Health and Human Services, and required the FDA to "protect the public health" by ensuring that "drugs are safe and effective." 21 U.S.C. §393(b)(2)(B). The Act provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug." 21 U.S.C. §355(a).

83. New pharmaceutical drugs, such as SB204, that will be commercially distributed in the United States must receive FDA approval prior to sale and marketing. It is through the FDA's

new drug application ("NDA") process that drug sponsors propose new drugs to the FDA. The NDA process is designed to provide FDA reviewers with sufficient information to reach the following key decisions: (a) "[w]hether the drug is safe and effective in its proposed use(s)" (21 U.S.C. §393(b)(2)(B)); (b) "whether the benefits of the drug outweigh the risks" (21 U.S.C. §355-1(a)(1)); (c) "[w]hether the drug's proposed labeling (package insert) is appropriate, and what it should contain" (21 U.S.C. §355(b)(1) ("505(b)(1)")(F)); and (d) "[w]hether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity" (505(b)(1)(D) and 21 C.F.R. §314.50(d)(1)(i)).

84. New drug approvals typically require the FDA's acceptance of extensive clinical studies (testing on humans) and non-clinical studies (testing on animals and in labs). Clinical testing on humans is typically conducted in three or four sequential phases, which may overlap or be combined, including:

(a) **Phase 1**: The drug is initially introduced into healthy human subjects or patients with the target disease or condition and tested for safety, dosage tolerance, absorption, metabolism, distribution, excretion, and, if possible, to gain an early indication of its effectiveness.

(b) **Phase 2**: The drug is administered to a limited patient population to identify possible adverse effects and safety risks to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance and optimal dosage.

(c) **Phase 3**: the drug is administered to an expanded patient population, generally at geographically dispersed clinical trial sites, in well-controlled clinical trials aiming to generate enough data to statistically evaluate the efficacy and safety of the product for approval, to establish the overall risk-benefit profile of the product, and to provide adequate information for the labeling of the product.

(d) **Phase 4**: In some cases, the FDA may require, or companies may voluntarily pursue, additional clinical trials after a product is approved to gain more information about the product. In some cases, these Phase 4 studies are made a condition of approval of the NDA.

85. Each phase of clinical testing attempts to gather more information on drug safety and efficacy and requires an increase in the population size. Generally, Phase 1 studies typically focus on dose tolerance of a drug, Phase 2 studies focus both on dose tolerance and efficacy, and Phase 3 studies focus on efficacy and safety. Novan conducted Phase 1, Phase 2, and Phase 3 clinical trials of SB204.

### 3. At the Time of the Initial Public Offering, Novan Had Completed Its Phase 2 Clinical Trials on SB204

86. From April 2013 to August 2015, Novan initiated two Phase 2 clinical trials for SB204 dubbed: (a) NI-AC201 ("Phase 2a Trial"); and (b) NI-AC202 ("Phase 2b Trial") (collectively, the "Phase 2 Trials").

#### a. Phase 2a Trial

87. In April 2013, Novan commenced the Phase 2a Trial, which was a "multi-center, evaluator and subject blinded, randomized, vehicle-controlled, parallel group, dose-ranging study to be conducted in approximately 150 subjects with acne vulgaris."[6] The Phase 2a Trial included three

---

[6] The "multi-center" aspect meant that Novan was conducting the study at multiple medical centers or clinics, rather than at a single location. The "blinded" aspect meant that neither the participants nor the researchers knew which participants were in the control group (*i.e.*, not receiving SB204) and which participants were in the SB204 group. This characteristic limits unwanted biases or effects from researchers or participants. The "vehicle-controlled" aspect meant that the control group and test groups all used the same gel ("vehicle gel"), but for the test groups, the vehicle gel also included SB204 as an additional ingredient. This aspect allowed researchers to ensure that any effects found in the test groups were due to SB204 rather than to the vehicle gel or to any placebo effect. The "dose-ranging" aspect meant that there were multiple test groups, each of which received a different dose of SB204. This aspect allowed the researchers to determine the safety and effectiveness of different doses of SB204. Finally, the "parallel group" meant that each group received the same treatments throughout the study without any crossover of treatments. In other

arms: (a) a placebo/control group that used the vehicle gel twice daily; (b) an experimental group that used vehicle gel with 1% SB204 twice daily; and (c) an experimental group that used vehicle gel with 4% SB204 twice daily.

88. The primary outcome measure to be studied was the absolute change in non-inflammatory lesion counts at Week 12. Specifically, the study administrators would count the non-inflammatory lesions (*i.e.*, white heads and black heads) on each participant at the outset of the study to generate a "baseline" count, which would be compared to a similar count at the conclusion of the study. Novan would then compare those numbers to see if the results were different at a level that was statistically significant.

89. The secondary outcome measures were: (a) the absolute change in inflammatory lesion counts at Week 12; and (b) analysis of the dichotomized IGA scores. The measure for inflammatory lesions (*i.e.*, larger red bumps and pustules) functioned identically to the measure for non-inflammatory lesions.

90. The IGA score analysis, however, included a more detailed subjective component. At the outset and at the conclusion, the study administrators would review each participant and determine where their acne fit on the following scale of 0 to 4:

| Score | Description |
|---|---|
| **0** | Clear skin with no inflammatory or non-inflammatory lesions |
| **1** | Almost clear; rare non-inflammatory lesions with no more than one small inflammatory lesion |
| **2** | Mild severity; greater than Grade 1; some non-inflammatory lesions with no more than a few inflammatory lesions (papules/pustules only, no nodular lesions) |
| **3** | Moderate severity; greater than Grade 2; up to many non-inflammatory lesions and may have some inflammatory lesions, but no more than one small nodular lesion |

words, the control group received only vehicle gel throughout the study, whereas each test group received the same dosage of SB204 without any increase or decrease throughout the study.

| | |
|---|---|
| **4** | Severe; greater than Grade 3; up to many non-inflammatory and inflammatory lesions, but no more than a few nodular lesions |

91. At Week 12 (*i.e.*, the conclusion of the study), each participant would be deemed a "success" or a "failure" based on an IGA scoring analysis. A success was defined as a Week 12 score of 0 or 1 (*i.e.*, "clear" or "almost clear" skin) ***and*** a 2-point improvement from the original score. Any other result for a participant would be listed as failure. Novan could then compare the proportions of success and failure in each arm of the study. When the final results were considered, Novan sought to determine if there was a statistically significant effect from SB204, meaning the results showed that "there is a less than five percent likelihood that the observed results occurred by chance."

92. The Phase 2a Trial concluded in November 2013. On March 19, 2014, Novan issued a press release reporting that:

- "At four weeks, the 4% dose of SB204 demonstrated a statistically significant reduction in both noninflammatory (white heads and black heads) and inflammatory lesions (larger red bumps and pustules) compared to Vehicle . . . ."
- "Statistically significant reductions were also observed in both the primary and secondary endpoints for lesion types at the 12 week time point."

**b. Phase 2b Trial**

93. In November 2014, Novan commenced the Phase 2b Trial, which was a "Phase 2, Multi-Center, Randomized, Evaluator-Blinded, Vehicle-Controlled Study Comparing the Efficacy, Tolerability, and Safety of SB204 Gel and Vehicle Gel Once or Twice Daily in the Treatment of Acne Vulgaris." The Phase 2b Trial included five arms of participants receiving 12 weeks of treatment: (a) a placebo/control group that used the vehicle gel once daily; (b) placebo/control group that used the vehicle gel twice daily; (c) an experimental group that used vehicle gel with 2% SB204

twice daily; (d) an experimental group that used vehicle gel with 4% SB204 once daily; and (e) an experimental group that used vehicle gel with 4% SB204 twice daily.

94. The primary outcome measures consisted of: (a) absolute change in inflammatory lesion count; (b) absolute change in non-inflammatory lesion count; and (c) proportion of participants with success under the IGA. The secondary outcome measures included: (a) percent change in inflammatory lesion count; (b) percent change in non-inflammatory lesion count; and (c) median time to improvement. Once again, Novan sought to conclude that SB204 had a statistically significant effect as to those measures when compared to participants using only vehicle gel.

95. On March 18, 2015, Novan announced that it had reached its target enrollment of 200 participants for the Phase 2b Trial. Novan also stated that "[t]he primary objective of the study is to compare efficacy, tolerability, and safety of SB204 Gel versus Vehicle Gel applied topically once or twice daily for up to 12 weeks."

96. Novan concluded the Phase 2b Trial in August 2015. On September 29, 2015, Novan announced the results, stating that:

- "The Phase 2b study demonstrated statistically significant reductions in the percent change of non-inflammatory (white heads and black heads) and inflammatory (larger red bumps and pustules) lesions at Week 12 with all doses of SB204 compared to Vehicle."

- "At the end of treatment, the only dose group to be statistically significant in both absolute change and percent change for both lesion types was the SB204 4% once daily treatment arm."

- "A 6% difference between the pooled SB204-treated subjects and Vehicle-treated subjects was observed in the Investigator Global Assessment (IGA) endpoint."

97. Relying on these encouraging results from the Phase 2 Trials, Novan indicated that it planned to conduct two Phase 3 Trials in the first quarter of 2016. Novan specified that the

Company would study the once daily use of SB204, with a targeted enrollment of 1,300 participants per trial.

### 4. Novan and the FDA Met Prior to the Start of Its Two "Identically Designed" Phase 3 Trials

98. Following its Phase 2 Trials on SB204, but prior to commencing its Phase 3 Trials, Novan representatives met with the FDA and held discussions regarding an SPA. An SPA is designed to facilitate the FDA's review and approval of drugs by allowing the FDA to evaluate, in part, the proposed design and size of the Phase 3 clinical trials that are intended to form the primary basis for determining efficacy. Upon the request of the clinical trial sponsor, such as Novan, the FDA will evaluate the Phase 3 study protocol and respond to questions on topics such as primary efficacy endpoints, trial conduct, and data analysis, within 45 days of receipt of the request. Ultimately, the FDA is required to assess whether the protocol design and planned analysis of the trial are acceptable to support regulatory approval of the drug with respect to effectiveness of the indication studied.

99. Unbeknownst to investors, while discussing an SPA for the Phase 3 Trial of SB204, the FDA advised Novan to study the effect of SB204 on women who were also taking oral contraceptives with an acne indication – *i.e.*, oral contraceptives that are also FDA-approved acne treatments. The FDA also advised the Company that Novan should separately report the data from those specific study participants. Instead of disclosing the FDA's request that Novan study SB204 on this unique, specific patient population and report the data separately, the Exchange Act Defendants, through the Prospectus, announced to investors that "[w]e have previously made . . . a submission for an SPA to the FDA in connection with the design of our Phase 3 clinical trials for SB204" and "[w]e received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA."

100. Thus, investors had no knowledge that the FDA had explicitly communicated to Novan that there was a need to study and separately report the interaction between SB204 and women taking oral contraceptives with an acne indication – *i.e.*, oral contraceptives that are FDA-approved treatments for acne.

**5. During the Class Period, the Exchange Act Defendants Repeatedly Stressed that Novan Was Conducting Two "Identically Designed" Phase 3 Trials on SB204**

101. In February 2016, Novan commenced its two SB204 Phase 3 Trials: (a) NI-AC301 and (b) NI-AC302. In the Company's February 23, 2016 press release, Novan announced that its first Phase 3 Trial participant had been dosed with SB204, which "represent[ed] an important milestone for Novan in the development of our lead product candidate."

102. Regarding the structure of the trial design protocol, Novan stated that "[t]he Company [was] running two ***identically designed*** Phase 3 pivotal trials in parallel and expects to report top-line results in the first half of 2017." In the August 2016 Registration Statement, Novan reiterated that "[i]n the first quarter of 2016, we commenced two ***identically designed*** Phase 3 pivotal clinical trials of SB204 in which we expect to enroll a total of 2,600 patients with acne vulgaris." The Exchange Act Defendants also explained that they had "***designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015***." Moreover, every additional public statement by the Exchange Act Defendants regarding the Phase 3 Trials indicated that they were identical.

103. Like the Exchange Act Defendants' statements, publicly available information about the Phase 3 Trials created the appearance that they were, in fact, identical. For example, the Company labeled both Phase 3 Trials, NI-AC301 and NI-AC302, with the same official title: "A

Phase 3 Multi-Center, Randomized, Double-Blinded, Vehicle-Controlled, Parallel Group Study Comparing the Efficacy, Tolerability and Safety of SB204 and Vehicle Gel Once Daily in the Treatment of Acne Vulgaris."

104. Other factors made the Phase 3 Trials appear identical as well. Both trials had enrollment targets of 1,300 patients to be randomly assigned to one of two groups to be treated over 12 weeks: (a) an experimental group that used vehicle gel with SB204 4% topically once daily; and (b) a placebo/control group that used only the vehicle gel once daily. Both Phase 3 Trials also had the same primary endpoints (*i.e.*, absolute change in inflammatory lesion count, absolute change in non-inflammatory lesion count, and proportion of participants with success under the IGA) and secondary endpoints (*i.e.*, percent change in inflammatory lesion count, percent change in non-inflammatory lesion count, time to reduction in inflammatory lesion count, and time to improvement in IGA).

105. Additionally, both Phase 3 Trials had the same eligibility criteria:

- Inclusion Criteria:
  - moderate to severe acne
  - minimum of 25 and no more than 70 non-inflammatory lesions (open and closed comedones) on the face
  - minimum of 20 and no more than 40 inflammatory lesions (papules and pustules)
- Exclusion Criteria:
  - women of child-bearing potential who are pregnant, nursing, considering becoming pregnant
  - any dermatologic condition that could interfere with clinical evaluations including severe, recalcitrant cystic acne

106. The Phase 3 Trials were described in detail on a publicly accessible website, acnetrials.com, which described the Phase 3 Trials as a single trial and made no distinction between the two. Importantly, the Phase 3 Trial website's "inclusions/exclusion parameters" specified that

"*[y]ou may be a candidate for this study if you . . . [a]re willing to not use any other acne treatment during the study*."[7]

107. In sum, the Exchange Act Defendants unequivocally described the design of NI-AC301 and NI-AC302 as ***identical*** and did not publicly disclose any material distinctions between those trials. In reality, the Exchange Act Defendants deliberately established at least one material difference between the Phase 3 Trials, and knew of, but failed to disclose, other material differences.

### 6. The Exchange Act Defendants Concealed that the Phase 3 Trials Had Material Differences

#### a. The Exchange Act Defendants Purposefully Included Other FDA-Approved Acne Medications in NI-AC301, but Not in NI-AC302

108. As described above, Novan's Phase 3 website stated clearly that participants must be "willing to ***not*** use any other acne treatment during the study." The utility of that condition was obvious because participants' use of other acne medications could significantly alter key characteristics of the Phase 3 Trials and/or substantially skew the results. As one example, if members of the control (or vehicle) group were using other acne medications, those individuals might experience a significant loss of inflammatory/non-inflammatory lesions. Then, it would be more difficult and less likely for the experimental groups (receiving SB204) to exceed that loss and demonstrate that SB204 had a statistically significant effect of reducing lesions. Alternatively, if members of the experimental groups were using other acne medications (in addition to SB204), then it would be difficult to attribute any acne reduction to SB204 rather than the other acne medication, or to a combination of the other medication and SB204. In any case, the inclusion of other FDA-approved acne medications into any of the arms of the Phase 3 Trials would add an entirely new

[7] Novan, Inclusion/Exclusion Parameters, http://acnetrials.com/inclusionexclusion-parameters/ (last visited Apr. 27, 2018).

variable that would necessarily affect the administration of, data generated from, statistical analyses performed on, and results of the Phase 3 Trials.

109. Nonetheless, without providing ***any*** public disclosures to investors or otherwise, the Exchange Act Defendants purposefully designed NI-AC302 to exclude participants taking certain specified FDA-approved acne medications, but deliberately designed NI-AC301 to include a limited number of participants taking those same FDA-approved acne medications. Specifically, the FDA has approved certain oral contraceptives with an acne indication, *i.e.*, as acne treatments, such as Yaz and Ortho Tri-Cyclen.[8] For NI-AC302, the Exchange Act Defendants purposefully excluded all women (and men) who were taking any acne treatments. For NI-AC301, however, the Exchange Act Defendants purposefully included a subset of female participants who were taking oral contraceptives that doubled as FDA-approved acne treatments. This violated the publicly stated inclusion/exclusion criteria for the Phase 3 Trials.

110. This undisclosed difference between NI-AC301 and NI-AC302 was critical. By excluding individuals who were using any FDA-approved acne treatments, NI-AC302 guaranteed that the trial's results would not reflect any effects from other acne medications. Indeed, the Exchange Act Defendants explicitly stated to investors that "[i]f approved by the FDA for the treatment of acne vulgaris, we anticipate that SB204 would compete with branded and generic . . . oral contraceptives." In other words, Novan was developing SB204 to compete with oral contraceptives approved by the FDA for treating acne. It was, therefore, reasonable to expect the Exchange Act Defendants to test SB204's efficacy while eliminating any effects from or interaction with the treatments that SB204 was meant to compete with.

[8] *See* WebMD, *Birth Control for Acne*, https://www.webmd.com/skin-problems-and-treatments/acne/birth-control-for-acne-treatment#1 ("[t]he FDA has approved the following [three] types of birth control for acne") (last visited Apr. 26, 2018).

111. NI-AC301, on the other hand, included a distinct sub-population of participants who were using oral contraceptives that were FDA-approved acne treatments, creating an entirely different clinical dynamic from NI-AC302. The inclusion of unique participants in NI-AC301 had the distinct potential to: (a) affect whether NI-AC301 met its primary and secondary endpoints; and (b) alter the conclusions that could be drawn from NI-AC301's failure or success as to those endpoints. Even success as to the primary and secondary endpoints would require further analysis to determine whether SB204 alone (*i.e.*, not coupled with an FDA-approved acne medication) could demonstrate statistically significant success.

112. Consequently, NI-AC301 and NI-AC302 were materially different, and those differences created unique risks which investors were not informed of and could not take into account when making investment decisions regarding Novan and when assessing the likelihood that SB204 would achieve its study endpoints. Specifically, while investors knew that the Phase 3 Trials were studying SB204's efficacy, investors did ***not*** know that:

- One of the Phase 3 Trials was also studying the efficacy of taking SB204 in addition to an FDA-approved acne medication in the form of an oral contraceptive;
- If SB204 met any primary or secondary endpoints, the use of FDA-approved acne medications – rather than the use of SB204 alone – might have caused that success in part or in whole; and
- If SB204 failed to meet any primary or secondary endpoints, the use of FDA-approved acne medications – rather than the use of SB204 alone – might have caused that failure in part or in whole.

113. Without that knowledge, investors could not make informed investment decisions accounting for the material risks and benefits posed by the Phase 3 Trials, the outcome of which was poised to have significant impact on Novan's financial condition and outlook.

**b. The Exchange Act Defendants Concealed that They Used an Insufficient Sample Size to Study the Interaction Between SB204 and FDA-Approved Acne Medications**

114. In NI-AC301, the Exchange Act Defendants enrolled only 14 participants on oral contraceptive acne medications to study the efficacy of SB204. This limited sample size – indeed, the Phase 3 Trials had 2,633 participants – was another material fact concealed from investors.

115. Clinical studies generally require sufficiently large sample sizes:

> Whatever be the aim, one can draw a precise and accurate conclusion only with an appropriate sample size. A smaller sample will give a result which may not be sufficiently powered to detect a difference between the groups and the study may turn out to be falsely negative . . . . A study on a small sample is quite tempting for obvious reasons, but it is a waste of time and money as the result will be invariably inconclusive.[9]

116. The Exchange Act Defendants knowingly or recklessly ignored that fundamental precept. As was belatedly revealed, *see* ¶¶123-131, the Exchange Act Defendants sought "to evaluate treatment effectiveness in women on oral contraceptive prescriptions with an acne indication." To make that evaluation across two trials with 2,633 total participants, however, the Exchange Act Defendants included only 14 female participants who were also using an oral contraceptive with an acne indication (*i.e.*, an oral contraceptive that was approved by the FDA to treat acne). In other words, only 0.5% of the total participants – or 1.1% of the 1,306 participants in NI-AC301 – possessed a key characteristic that the Exchange Act Defendants intended to evaluate – a characteristic that, unbeknownst to investors, the FDA had explicitly flagged during the Company's end-of-Phase 2 meetings regarding the Phase 3 Trials and a potential SPA for those trials.

---

[9] Barun Kumar Nayak, *Understanding the relevance of sample size calculation*, U.S. Nat'l Library of Medicine, Nat'l Institutes of Health (Nov.-Dec. 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2993974/ (last visited April 30, 2018).

117. Moreover, the fact that only 0.5% of the total participants in the Phase 3 Trials – or 0.9% of the 1,615 women in the Phase 3 Trials – were using FDA-approved acne medications and that all of those participants fell into only one of the trials indicates that the Company was misrepresenting and/or concealing material information about the trials. First, it was not mere chance that NI-AC301 included 14 participants using oral contraceptives with an acne indication but NI-AC302 included none. Novan necessarily asked every potential participant to identify whether they were taking any of the oral contraceptives that were FDA-approved for treating acne. Novan then purposefully ***excluded*** all such participants from NI-AC302, but ***included*** such participants in NI-AC301. In other words, the Exchange Act Defendants carefully crafted and implemented screening criteria that led to the small sample size and that ***were never publicly disclosed***. Second, for NI-AC301, Novan secretly violated its publicly stated inclusion/exclusion criteria, which required participants "willing to not use any other acne treatment during the study." Third, the diminutive subgroup of 14 participants did not have the potential to provide statistically significant data regarding the interactive effectiveness of SB204 with oral contraceptives that were also FDA-approved acne medications. Nonetheless, those 14 participants did have the ability to cause NI-AC301 to miss certain endpoints. In other words, the Exchange Act Defendants did not disclose to investors that the subgroup was too small to provide valuable data about the interaction between the FDA-approved oral contraceptive/acne medications and SB204 but was large enough to materially affect the overall results regarding SB204. These calculated choices indicate that Novan intentionally made NI-AC301 and NI-AC302 ***non-identical*** and misled investors about the materially different characteristics between those trials.

118. If investors had known that 14 out of 2,633 total participants in the Phase 3 Trials were using oral contraceptives that doubled as FDA-approved acne treatments, then investors could

have accounted for the risks and benefits that the subgroup posed to the overall results of the Phase 3 Trials, as well as to the results of NI-AC301. Because of the Exchange Act Defendants' concealment, however, investors were not given that chance and instead incurred significant financial losses when the truth was revealed and the artificial inflation was released from the price of Novan stock.

#### c. The Exchange Act Defendants Concealed that the Participants in NI-AC301 Had More Severe Acne than the Participants in NI-AC302

119. On September 28, 2016, the Exchange Act Defendants announced that Novan had enrolled the last participant in the Phase 3 Trials. At that time, therefore, the Exchange Act Defendants had baseline data for all of the participants in the Phase 3 Trials. As stated above, *see* ¶¶90-91, 104, each participant would be given an IGA score (0 to 4) at the outset of the trial and at the end of the trial. At the end of the trial, the participant would be deemed an IGA "success" or "failure." To be a "success," the participant required a final score of 0 (clear) or 1 (almost clear) ***and*** an improvement of at least 2 points. Consequently, any participant with a beginning IGA score of 4 (severe) would have to improve by at least 3 points (from 4 to 1) in order to be a "success," whereas a participant with a beginning IGA score of 3 (moderate severity) could be a "success" after improving by only 2 points (from 3 to 1).

120. Unbeknownst to investors, the Phase 3 Trials included materially different patient populations, and those differences rendered IGA success to be substantially less likely in NI-AC301 than in NI-AC302. Specifically, of the 1,306 participants in NI-AC301, 13.2% (172 participants) had baseline IGA scores of 4 (severe). In NI-AC302, by contrast, only 10.6% of the 1,327 participants had that high of a baseline score. This distinction between NI-AC301 and NI-AC302 created a statistically significant difference between the two patient populations in the trials: the

participants in NI-AC301 were sicker (to a statistically significant degree) than the participants in NI-AC302. NI-AC301, therefore, had a material disadvantage in terms of meeting the IGA endpoint.

121. From a statistical perspective, the baseline IGA differences between NI-AC301 and NI-AC302 resulted in a p-value of 0.044, meaning there was a statistically significant difference between the studies at a 95.6% confidence level.[10] In other words, there was only a 4.4% probability that random chance had led to the participants in NI-AC301 and NI-AC302 having such different baseline IGA levels. On the other hand, there was a 95.6% probability that a distinct characteristic of how the studies were being administered caused those differences in baseline IGA levels. This indicates that when assigning IGA scores, the study administrators in each study were either stricter or more liberal than their counterpart study administrators in the other study. In any case, this statistically significant distinction between baseline IGA scores of participants in NI-AC301 versus NI-AC302 confirmed those two Phase 3 Trials were ***not*** identically designed: the participants in NI-AC301 were sicker (*i.e.*, had more severe acne) than the participants in NI-AC302.

122. Importantly, upon enrollment in the Phase 3 Trials, the Exchange Act Defendants would have been presented with exacting data detailing the baseline IGA scores of participants in NI-AC301 and NI-AC302. The Exchange Act Defendants knew or recklessly disregarded that there was a statistically significant and material difference between the participants' baseline IGA scores in the two studies, thus rendering the studies non-identical. The Exchange Act Defendants, however, did not disclose that material information to investors. Consequently, investors did not know that

[10] P-value is a term used to measure the strength, or significance, of statistical evidence in hypothesis tests. Hypothesis tests are used to test the validity of a claim that is made about a population. The p-value is a number between 0 and 1, and a small p-value (typically less than or equal to 0.05) indicates strong evidence.

each study posed materially different risks vis-à-vis success or failure in meeting the IGA endpoint. When NI-AC301 ultimately failed to meet that endpoint, the market was stunned, and Novan's stock price plummeted.

### 7. The Exchange Act Defendants Reveal Materially Discrepant Results for the Purportedly "Identical" Phase 3 Trials

123. Before the market opened on January 27, 2017, Novan shocked investors by reporting discordant results for its purportedly "identical" Phase 3 Trials of SB204. The Exchange Act Defendants stated, "Novan's topical nitric oxide-releasing product candidate SB204 demonstrated statistical significance ($p<0.05$) compared to vehicle on ***all three*** co-primary endpoints in NI-AC302, but demonstrated statistical significance on ***only one*** of three co-primary endpoints in NI-AC301." More specifically, the Exchange Act Defendants reported the following:

| | <u>Endpoint 1</u><br>To a statistically significant degree, did SB204 reduce non-inflammatory lesions more than vehicle gel (placebo) did? | <u>Endpoint 2</u><br>To a statistically significant degree, did SB204 reduce inflammatory lesions more than vehicle gel (placebo) did? | <u>Endpoint 3</u><br>To a statistically significant degree, did more participants achieve IGA Success after receiving SB204? |
|---|---|---|---|
| NI-AC301 | **Yes<br>(97.0% certainty)** | **No** | **No** |
| NI-AC302 | **Yes<br>(99.9% certainty)** | **Yes<br>(99.9% certainty)** | **Yes<br>(96.8% certainty)** |

124. This news signaled to investors – for the first time – that the "two Phase 3 multi-center, randomized, double-blinded, vehicle-controlled, parallel group pivotal clinical trials, NI-AC301 and NI-AC302" were not in fact "identical."

125. In the press release, Defendant Stasko stated, "While we are pleased with the results of the NI-AC302 trial that met the regulatory requirement for statistically significant efficacy of

SB204, we are disappointed with the discordant results of NI-AC301." Defendant Stasko did not discuss the known reasons behind the differences in the studies, stating instead that "[o]ur team has not yet received the full data set and we intend to provide an update on the SB204 program after our complete analysis." Defendant Stasko further emphasized that "[d]espite these discordant results, we believe in the potential of nitric oxide's multiple, well-documented mechanisms of action and the data we have recently generated for our SB206 anti-viral and SB414 anti-inflammatory product candidates."

126. On news of these materially inconsistent results in what were supposed to be two identical Phase 3 Trials, the price of Novan stock plummeted. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, ***a decline of 74%***, on abnormally high trading volume of more than 8 million shares.

**8. The Exchange Act Defendants Further Reveal the Truth Regarding the Material Difference Between the Two Phase 3 Trials for SB204**

127. On March 6, 2017, more than a month after the Phase 3 Trial results were released, the Individual Defendants hosted a conference call with investors wherein Defendant Stasko further confirmed that the Company had designed and implemented material differences between NI-AC301 and NI-AC302. More specifically, Defendant Stasko revealed that while the "enrollment criteria did exclude patients on other oral and topical acne treatment, it ***did not*** exclude women on oral contraceptive prescriptions that have an acne indication." Defendant Stasko stated that "[a]s part of our special protocol assessment, the FDA had encouraged the company to run our analyses both with and without women on oral contraceptive prescription with an acne indication ***and to report the data***

***separately***."[11] Defendant Stasko stated that "[w]e believe this was a contributor to the reduced separation on inflammatory lesions between active and vehicle in the 301 trial." He further revealed that the SB204 arm of NI-AC301 enrolled a larger number of participants with severe acne or 14.7% versus 9.7% in NI-AC302. According to Defendant Stasko, this also "contributed to reduced IGA success in patients."

128. As part of Novan's review of the Phase 3 Trials, Defendant Stasko admitted that "management has identified several aspects of a well controlled trial design that we believe will increase the chance for success in future studies," implicitly conceding that there were material deficiencies that rendered the SB204 Phase 3 Trial design problematic.

129. During the question and answer portion of the March 6, 2017 call, Defendant Stasko explained that "there wasn't anything that stood out based on their severity [women on oral contraceptives] . . . I would predict that they were more moderate." He also disclosed for the first time that prior to enrollment each of the 14 women already taking acne medication "had to be on a stable regimen" of oral contraceptives "for at least three months."

130. Novan's March 6, 2017 conference call revealed to investors ***for the first time*** that:

(a) as part of Novan's end-of-Phase 2 meetings and SPA discussions with the FDA, the FDA explicitly encouraged Novan to study the interaction between SB204 and oral contraceptives that were FDA-approved acne medications and to report that data separately;

(b) despite Novan's publicly stated criteria that participants should not be taking other acne medications, Novan included 14 participants in NI-AC301 who were using FDA-approved acne medications;

---

[11] Despite the FDA's recommendation that Novan report the date separately, Novan did not do so when it released the Phase 3 Trial results on January 27, 2017.

(c) Novan excluded ***any*** participants from NI-AC302 who were using FDA-approved acne medications; and

(d) Novan included only 14 participants out of 2,633 who were taking the FDA-approved acne medications and the inclusion of those 14 participants caused NI-AC301 to fail its primary endpoint regarding inflammatory lesions.

131. If investors had known that Novan was including in one of the Phase 3 Trials a subset of participants who were using oral contraceptives that doubled as FDA-approved acne medications, then investors could have accounted for the risks those participants posed vis-à-vis the forthcoming results of the Phase 3 Trials. At a minimum, investors would have known that the intersection of SB204 and women on oral contraceptives with an acne indication was an area of FDA concern. Instead of knowing these facts, investors were blind-sided by NI-AC301's failure to match the results of the supposedly identically designed NI-AC302. Consequently, the Exchange Act Defendants' materially misleading statements and omissions caused Novan stock to drop ***74%*** in a single day as the artificial inflation was removed.

### C. The Exchange Act Defendants' False and Misleading Statements and Omissions

132. Plaintiff incorporates ¶¶46-51 as though fully set forth herein, including the false statements and omissions made in the Offering Documents.

133. On November 14, 2016, the Company issued a press release reporting its financial results for the third quarter ended September 30, 2016. The press release stated that Novan was developing SB204, for the treatment of acne vulgaris, acne and that "***the two identically designed Phase 3 pivotal clinical trials for SB204 were fully enrolled ahead of schedule.***" The press release further stated that "***Novan expects to announce top-line results from these parallel pivotal trials in the first quarter of 2017***" and "***[a]ssuming successful completion of these Phase 3 pivotal trials***

***and the long-term safety study, the Company is targeting submission of a new drug application for SB204 to the U.S. Food and Drug Administration by the end of 2017.***"

134. Also on November 14, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter ended September 30, 2016 ("3Q16 10-Q"). The 3Q16 10-Q was signed by Defendants Stasko and Peterson and included Sarbanes-Oxley certifications signed by each of them attesting that the 3Q16 10-Q did not contain any untrue statements of material fact or omit any material fact necessary to make the statements made not misleading. Regarding SB204, the 3Q16 10-Q reiterated that "***[i]n the first quarter of 2016, [Novan] commenced two identically designed Phase 3 pivotal clinical trials of SB204 to evaluate safety and efficacy***" and that Novan "***completed enrollment in both trials ahead of schedule by randomizing the last patient in September 2016, bringing the total number of enrolled patients to 2,600.***" The 3Q16 10-Q stated that "***[p]er the study protocol, the last patient randomized will be treated for 12 weeks.***" The Company also confirmed that it "***expect[s] to report top-line results from the two parallel trials in the first quarter of 2017***" and that "***[a]ssuming successful completion***" is "***targeting submission of our new drug application, or NDA, for SB204 to the U.S. Food and Drug Administration, or the FDA, by the end of 2017.***"

135. The statements referenced in ¶¶47-50 and ¶¶133-134 above were materially false and misleading and omitted material facts because they:

(a) falsely described the two Phase 3 Trials for SB204, NI-AC301, and NI-AC302, as "identical," when, in fact, one of the trials included a specific patient population – women on oral contraceptive prescriptions – that was not present in the other clinical trial;

(b) falsely described the two Phase 3 Trials for SB204, NI-AC301, and NI-AC302, as "identical," when, in fact the Exchange Act Defendants knew or recklessly disregarded

that the number of "severe" baseline IGA scores in NI-AC301 deviated from those in NI-AC302 by a statistically significant amount that could not be assigned to random chance, which rendered the two studies not-identical;

(c) omitted disclosure of key aspects of the Company's business, specifically distinctions within the Company's Phase 3 Trials, which altered the likelihood that SB204 would achieve its study endpoints;

(d) omitted that the FDA had encouraged Novan, as part of its end-of-Phase 2 discussions and meetings regarding an SPA for the SB204 Phase 3 Trials, to evaluate treatment effectiveness of SB204 in women on oral contraceptive prescriptions with an acne indication, such as Yaz or Ortho-Tricyclen, and that the inclusion of such women in one of the SB204 trials, but not the other, was likely to impact the Phase 3 Trial results;

(e) omitted that the FDA had encouraged Novan, as part of its end-of-Phase 2 discussions and meetings regrading an SPA for the SB204 Phase 3 Trials, to separately report the data regarding women on oral contraceptives with an acne indication;

(f) omitted that the inclusion of women on oral contraceptives that doubled as FDA-approved acne treatments violated the publicly stated inclusion/exclusion criteria for the Phase 3 Trials on SB204;

(g) omitted that Novan was using only 0.5% of the Phase 3 clinical test participants (14 out of 2,633 patients) and only one of the two Phase 3 Trials to study a specific patient population and drug efficacy interaction that the FDA had identified as important;

(h) omitted that the enrollment for NI-AC301 and NI-AC302 indicated that the baseline IGA scores for participants in NI-AC301 were worse at a statistically significant level, rendering it less likely that NI-AC301 could meet its third primary endpoint;

(i) omitted information regarding SB204, leaving investors unable to accurately assess the validity of the Exchange Act Defendants' statements regarding the status of SB204 and its potential for commercialization; and

(j) as a result of the foregoing, the Exchange Act Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

**D. The Truth Emerges**

136. As set forth above, before the market opened on January 27, 2017, Novan announced the top-line results of its two "replicate" Phase 3 Trials of SB204. Although the drug hit all of its goals in NI-AC302, it failed to beat the placebo in NI-AC301. More specifically, the press release stated, "In the intent-to-treat analysis, Novan's topical nitric oxide-releasing product candidate SB204 demonstrated statistical significance ($p<0.05$) compared to vehicle on all three co-primary endpoints in NI-AC302, but demonstrated statistical significance on only one of three co-primary endpoints in NI-AC301." The press release explained that "[t]he three co-primary endpoints included the absolute changes in inflammatory and non-inflammatory lesion counts and proportion of patients achieving success on the Investigator Global Assessment, or IGA, at week 12." Accordingly, "[s]uccess was defined as an improvement of at least two grades in the IGA score from baseline and an IGA score of 0 or 1, or 'clear' or 'almost clear.'"

137. Novan once again described the two Phase 3 Trials, stating "these two Phase 3 multi-center, randomized, double-blinded, vehicle-controlled, parallel group pivotal clinical trials, NI-AC301 and NI-AC302, a total of 2,639[12] patients ages 9 and older with moderate to severe acne

[12] Subsequent disclosures by Novan indicated that 2,637 participants enrolled in the Phase 3 Trials but the results excluded four participants because the "study drug [was] not dispensed." Accordingly, the Phase 3 Trials included 2,633 total participants.

were enrolled across a total of 110 sites in the United States, randomized in a 1:1 ratio to SB204 Gel 4% topically once-daily or vehicle gel topically once-daily and treated for 12 weeks." The press release also provided "[s]ummary statistics" which were "based on the use of a multiple imputation methodology for missing data." These statistics include:

- The absolute change from baseline in the number of non-inflammatory lesions in NI-AC301 was -15.4 for SB204 and -13.4 for vehicle (p=0.030), and in NI-AC302 was -14.9 for SB204 and -12.3 for vehicle (p=0.001).

- The absolute change from baseline in the number of inflammatory lesions in NI-AC301 was -12.1 for SB204 and -11.1 for vehicle (p=0.114), and in NI-AC302 was -12.9 for SB204 and -10.6 for vehicle (p<0.001).

- The proportion of patients with IGA success in NI-AC301 was 13.4% for SB204 and 13.8% for vehicle (p=0.866), and in NI-AC302 was 18.9% for SB204 and 14.3% for vehicle (p=0.032).

138. The Company also provided detail on the "secondary endpoints for percent change in lesion counts" for each study, as well as the proportion of participants achieving IGA success, as shown in the table below:

| | NI-AC301 | | NI-AC302 | | |
|---|---|---|---|---|---|
| Non-Inflammatory Lesion Reduction | | | | | |
| SB204, 4% | 39 | %* | 42 | %* | |
| Vehicle | 34 | % | 34 | % | |
| Inflammatory Lesion Reduction | | | | | |
| SB204, 4% | 46 | % | 51 | %* | |
| Vehicle | 43 | % | 41 | % | |
| IGA Success | | | | | |
| SB204, 4% | 13.4 | % | 18.6 | %* | |
| Vehicle | 13.8 | % | 14.3 | % | *p<0.05 |

139. In the press release, Defendant Stasko stated, "While we are pleased with the results of the NI-AC302 trial that met the regulatory requirement for statistically significant efficacy of SB204, we are disappointed with the discordant results of NI-AC301." He continued, "Our team has not yet received the full data set and we intend to provide an update on the SB204 program after our

complete analysis." Defendant Stasko continued that "[d]espite these discordant results, we believe in the potential of nitric oxide's multiple, well-documented mechanisms of action and the data we have recently generated for our SB206 anti-viral and SB414 anti-inflammatory product candidates."

140. On news of these conflicting results in what were supposed to be two identical studies, the price of Novan stock plummeted. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than 8 million shares.

### E. Post-Class Period Revelations Concerning the Negative Effects that the Misleading Statements and Omissions Regarding the Phase 3 Trials Had Caused for SB204's Approval Timeline and Novan's Operations

141. Despite the Phase 3 Trials' failure, the Exchange Act Defendants continued to emphasize the Company's commitment to SB204. For example, before the market opened on March 6, 2017, Novan issued a release stating that after an "in-depth examination of the data sets" and based on conversations with "consultants in biostatistics and regulatory affairs," Novan "intends to proceed with the SB204 development program." The release further stated that Novan "intends to pursue a pre-submission meeting with the U.S. Food and Drug Administration, or FDA, to discuss the entirety of the SB204 development program in the third quarter of 2017, which could lead to a new drug application, or NDA, submission targeted in the first quarter of 2018." The press release also confirmed that Novan "continues to believe that the Company's cash on hand is sufficient to fund operations at least through the end of 2017, advancing each of the Company's development programs through its nearest-term milestone" and "anticipates that additional funding will be required to support SB204 through the FDA process, including the cost of an additional well-controlled trial, as well as to fund operations beyond 2017."

142. On March 20, 2017, the Company issued a press release announcing its fourth quarter and full year 2016 financial results. The release revealed that "Novan [was] evaluating a number of financing options . . . to provide additional funding that will be required to support development of SB204 through the FDA process, including the cost of an additional well-controlled trial, and to fund operations for platform programs beyond 2017, including the cost of two Phase 3 pivotal clinical trials of SB206." The press release reiterated that Novan "intends to pursue a pre-submission meeting with the FDA to discuss the entirety of the SB204 development program in the third quarter of 2017, which could lead to a new drug application, or NDA, submission in the first quarter of 2018, assuming among other things successful completion of the Company's ongoing long-term safety study." Novan also stated that it "expect[ed] to finalize plans for an additional well-controlled clinical trial with SB204 to be conducted in parallel with the FDA review to support NDA approval."

143. Despite Novan's attempts to paint an optimistic picture, the Exchange Act Defendants' false and misleading statements and omissions had triggered dire consequences that could have been avoided if investors had been given truthful and complete information regarding the differences between NI-AC301 and NI-AC302.

144. Consequently, on March 22, 2017, the Company announced "adjustments to the executive management team." Specifically, Novan announced that Defendant Peterson was "leaving to pursue other business interests" and would be replaced, "effective immediately," by interim CFO Hodges. The release also stated that Novan was creating a new executive position of Chief Development Officer ("CDO") to oversee "the tactical execution of clinical trials and the establishment of statistics and data management functions at the Company." The Company indicated the new CDO would "team with Dr. Joyce Rico, Chief Medical Officer, as Novan prepares

for upcoming interactions with the . . . FDA, including the planned pre-submission meeting regarding a potential new drug application for SB204."

145. On April 4, 2017, the Company announced formation of a new "Advisory Council" comprised of "key opinion leaders with broad expertise in dermatology" to "provide medical advice and drug-development insight to the Company's senior leadership team and board of directors."

146. On May 5, 2017, Novan filed an 8-K with the SEC, signed by interim CFO Hodges, disclosing that the Company's CMO, Rico, had resigned for "Good Reason" as defined in her less than one-year-old employment agreement with Novan dated August 25, 2016.

147. On May 12, 2017, the Company filed with the SEC on Form 10-Q its quarterly report for the first quarter ended March 31, 2017 ("1Q17 10-Q"). The 1Q17 10-Q included a "going concern" warning, and stated that "[t]he Company has concluded that these conditions raise substantial doubt about the Company's ability to continue as a going concern within one year from the date that these financial statements are issued." In an attempt to "mitigate these conditions," Novan planned to "raise additional funds through equity or debt financings or generate revenues from collaborative partners prior to the commercialization of the Company's product candidates."

148. Regarding SB204, the 1Q17 10-Q stated, "[w]e expect that one additional Phase 3 trial may be necessary to support FDA approval of SB204," that the Company is "currently assessing trial design enhancements," and "assessing cost, financial priorities and probabilities of success to determine if and when we will conduct this additional trial."

149. Then, on June 5, 2017, Novan announced that it was replacing CEO and co-founder Defendant Stasko with Defendant Martin, a member of the Company's Board, who would become interim CEO, and that Defendant Stasko would become the Company's President and Chief Scientific Officer. The Company also announced on June 5, 2017 that it was laying off 20% of its

workforce and that despite previously assuring investors that it was committed to SB204, the Company was now executing a plan to turn its focus to earlier-stage compounds that could have applications as topical treatments for inflammatory skin conditions, such as psoriasis and eczema.

150. Specifically, the June 5, 2017 release stated, "Given our near term business focus on executing less resource intensive phase 2 trials in psoriasis and atopic dermatitis, and the need to be disciplined with regard to cash utilization, the Company has reduced its overall headcount by approximately 20%." Novan hoped that "[t]his action will accomplish three things: reduce near term operating costs and preserve cash on our balance sheet, enable refined focus around key projects, and align necessary skills to near term tasks and activities." The press release also stated that Novan "will continue to evaluate the component parts of the business and adjust resources up or down as needed" and "continues to believe that the Company's cash on hand is sufficient to fund operations at least through the end of 2017."

151. With respect to Novan's balance sheet and focus going forward, Novan stated, "the Company will require additional capital in order to proceed on broadening the potential application of the science (nitric oxide) and the underlying technology, and specifically to initiate and complete the planned phase 2 trials in both psoriasis and atopic dermatitis." The press release further stated that "[a]dditional regulatory clarity surrounding SB204 for acne, as well as both SB206 and SB208, will provide important financial and strategic options as to how the Company strengthens its balance sheet and actively manages other financial considerations."

152. In response to the Company's June 5, 2017 disclosures, the price of Novan stock dropped 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling an additional 4% to close at $4.45 on June 6, 2017.

153. On August 2, 2017, the Company hosted a webcast to provide an overall update on Novan. During the webcast, the Exchange Act Defendants stated Novan had over $19 million of cash as of June 30, 2017, and that "[s]trengthening of the balance sheet is a near-term goal to enable an increase in operating runway." The webcast also revealed that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity." Following the webcast, the price of Novan stock declined from $5.48 on August 1, 2017 to $4.54 on August 2, 2017, a decline of more than 17%.

**F. Additional Scienter Allegations**

154. The Exchange Act Defendants' misstatements concerned Novan's lead product candidate, SB204. As set forth above in ¶¶98-107, *supra*, at all relevant times, Novan was conducting Phase 3 Trials of SB204, with the intent of submitting an NDA to the FDA by the end of 2017. SB204 was of the utmost importance to Novan and investors, as SB204 was the Company's product candidate that was the farthest along in the approval process and would have been the first product approved from its highly touted nitric oxide platform. It was clear to investors that Novan's future financial success and performance depended, in large part, on SB204's prospects for FDA approval. In addition, Novan told investors its "nitric oxide platform is well suited to disrupt the large and growing dermatology market, reported to be $28 billion in the United States in 2014[,]" and ultimately could "redefine the standard of care in dermatology." Given the importance of SB204 to Novan's future operations and financial performance, it is reasonable to infer that the Exchange Act Defendants were well aware of every aspect of the Phase 3 Trials, including: (a) all discussions with the FDA, including the FDA's instruction that Novan should study SB204's efficacy when coupled with oral contraceptives that were also FDA-approved acne treatments and

that Novan should report those results separately; (b) the inclusion of a distinct subgroup of participants in NI-AC301; and (c) the performance of SB204 in the trials.

155. The Exchange Act Defendants' scienter is also supported by multiple post-Class Period admissions. The Exchange Act Defendants ***admitted*** that the FDA had told Novan during end-of-Phase 2 discussions and SPA meetings that the Company's Phase 3 Trials should specifically include and separately report on participants who were already taking oral contraceptives that were FDA-approved acne medications. This fact was made even more important because the female participants taking FDA-approved acne medications ***still had*** moderate to severe acne with at least 25 non-inflammatory and 20 inflammatory lesions. Consequently, their acne symptoms had ***not*** previously responded to an FDA-approved acne treatment. Including participants that had ostensibly failed prior FDA-approved acne treatment had significant potential to create discordant results between NI-AC301 and NI-AC302, and was powerful evidence that the two Phase 3 Trials were not identical.

156. In response to FDA guidance prior to the IPO, the Exchange Act Defendants ***intentionally*** excluded participants taking FDA-approved oral contraceptive acne medications from NI-AC302, and at the same time ***intentionally*** included only 14 such participants in NI-AC301. Hence, the Exchange Act Defendants intentionally orchestrated – and, in turn, knew of – undisclosed differences between NI-AC301 and NI-AC302, yet concealed those differences from investors and instead repeatedly described the two Phase 3 Trials as identical.

157. Additionally, the Exchange Act Defendants knew – or, at a minimum, recklessly disregarded the fact – that the participants in the two Phase 3 Trials had materially different baseline IGA scores. Guidance issued by the FDA requires a sponsor (*i.e.*, Novan) to monitor the "[a]dherence to protocol eligibility criteria designed . . . to include only subjects from the targeted

study population for whom the test article is most appropriate"; develop and implement a monitoring plan that "address[es] unresolved or significant issues (*e.g.*, significant non-compliance with the investigational plan, suspected or confirmed data falsification) identified by monitoring"; and document all monitoring activities related to the trial.[13] Similarly, guidelines issued by the World Health Organization explicitly state that "[t]he sponsor [*i.e.*, Novan] is responsible for implementing a system of quality assurance in order to ensure that the trial is performed and the data are generated, recorded, and reported in compliance with the protocol."[14] Consequently, unless the Exchange Act Defendants shirked their duties in conducting the Phase 3 Trials, they closely monitored enrollment to ensure that the Phase 3 Trial protocol was accurately followed, and they knew of – or, at a minimum, were reckless as to – the statistically significant differences between the baseline IGA scores (*i.e.*, IGA scores at the time of enrollment) between participants in NI-AC301 and NI-AC302.

158. These facts collectively support a strong inference that the Exchange Act Defendants knowingly made materially false and misleading statements and omissions, or acted recklessly in doing so, during the Class Period.

### G. Loss Causation and Economic Loss

159. As detailed herein, during the Class Period, the Exchange Act Defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing, among other things, the true facts concerning the Phase 3 Trials. The Exchange Act Defendants' false and misleading statements and omissions, individually and collectively, concealed that the Phase 3 Trials

---

[13] Food and Drug Administration, *Guidance for Industry – Oversight of Clinical Investigations – A Risk-Based Approach to Monitoring* (Aug. 2013), https://www.fda.gov/downloads/Drugs/Guidances/UCM269919.pdf. (last visited Apr. 26, 2018).

[14] World Health Organization, *Guidelines for good clinical practice (GCP) for trials on pharmaceutical products*, http://apps.who.int/medicinedocs/pdf/whozip13e/whozip13e.pdf (last visited Apr. 26, 2018).

were not only not identical, but contained important distinctions that materially impacted their ability to meet their endpoints. While each of the Exchange Act Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by the Exchange Act Defendants' desire to artificially inflate the Company's stock price and give the market the false notion that Novan's Phase 3 Trials were identically designed and presented a high likelihood of success. The Exchange Act Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $29.09 during the Class Period, on December 7, 2016.

160. The truth began to emerge before the market opened on January 27, 2017, when, as detailed in ¶¶123-126, 136-140 above, the Company shocked investors by revealing the discordant results for its Phase 3 Trials. The Company revealed that although SB204 hit all of its goals in one of the trials, NI-AC302, it failed to beat the placebo in the other separate Phase 3 study, NI-AC301.

161. As a result of the information revealed to the market, the Company's stock plummeted approximately 74%, falling from a close of $18.70 per share on January 26, 2017, to a close of $4.86 per share on January 27, 2017, reaching a low of $3.52 per share. This decline in the Company's stock price was the direct result of the nature and extent of the revelations made to the market regarding the results of its Phase 3 Trials.

162. The timing and magnitude of the Company's stock price decline on January 27, 2017 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

163. In sum, the rapid decline in the Company's stock price on January 27, 2017, was the direct and foreseeable consequence of the revelation of the falsity of the Exchange Act

Defendants' Class Period misrepresentations and omissions to the market. Thus, the revelations of truth as well as the resulting clear market reaction support a reasonable inference that the market understood that the Exchange Act Defendants' prior statements were false and misleading. In short, as the truth about the Exchange Act Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff and other members of the Class were damaged, suffering true economic losses.

164. Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff and other members of the Class on January 27, 2017 were the direct and proximate result of the Exchange Act Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning the Exchange Act Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

**H. Presumption of Reliance**

165. A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions. Because this action involves the Exchange Act Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that the Exchange Act Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Exchange Act Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

166. A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine. As a result of the Exchange Act Defendants' materially false and misleading statements, Novan stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Plaintiff and other members of the Class (defined in ¶1 above) purchased or otherwise acquired Novan stock relying upon the integrity of the market price of the stock and the market information relating to Novan, and have been damaged thereby.

167. At all relevant times, the market for Novan stock was an efficient market for the following reasons, among others:

(a) As a regulated issuer, Novan regularly made public filings with the SEC and related press releases.

(b) Novan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services.

(c) Novan was followed by several securities analysts employed by major brokerage firms, such as Piper Jaffray, Wedbush, and JMP Securities, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

(d) Novan stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

168. As a result of the foregoing, the market for Novan stock promptly digested current information regarding Novan from all publicly available sources and reflected such information in the price of Novan stock.

169. Under these circumstances, all purchasers of Novan stock during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices, and a presumption of reliance applies.

170. At the times they purchased or otherwise acquired the Novan stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

171. As a result of the above circumstances, the presumption of reliance applies.

172. In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) the Exchange Act Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) Novan stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased or otherwise acquired Novan stock between the time the Exchange Act Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## I. No Safe Harbor

173. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

174. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, the Exchange Act Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Novan who knew that the statement was false when made. Moreover, to the extent that Exchange Act Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that the Exchange Act Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## COUNT III:

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Exchange Act Defendants

175. Plaintiff incorporates ¶¶1-24, 72-174 by reference.

176. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

177. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Novan stock during the Class Period.

178. In addition to the duties of full disclosure imposed on the Exchange Act Defendants, as a result of their affirmative false and misleading statements to the public, had a duty to promptly disseminate truthful information with respect to Novan's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to SB204, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

179. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Novan stock during the Class Period because, in reliance on the integrity of the market, they paid artificially inflated prices for Novan stock and experienced loses when the artificial inflation was released from Novan stock as a result of the partial revelations and stock price decline detailed

herein. Plaintiff and the Class would not have purchased Novan stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Novan and the Individual Defendants' misleading statements.

180. By virtue of the foregoing, each of the Exchange Act Defendants has violated Section 10b of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT IV:

### For Violations of Section 20(a) of the Exchange Act Against the Exchange Act Defendants

181. Plaintiff incorporates ¶¶1-24, 72-174 by reference.

182. The Individual Defendants acted as controlling persons of Novan within the meaning of Section 20(a) of the Exchange Act. By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause Novan to engage in the wrongful conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the decision-making of Novan, including the content and dissemination of Novan's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions alleged herein. Novan exercised control over and directed the actions of its senior managers, directors, and agents, including the Individual Defendants. Novan controlled the Individual Defendants, and all of its employees.

183. In their capacities as senior corporate officers and/or directors of Novan, and as more fully described herein, the Individual Defendants participated in the misstatements and omissions set forth above. Indeed, these Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Novan's clinical trials for SB204. Novan and the Individual Defendants had the ability to influence and direct, and

did so influence and direct, the activities of the Exchange Act Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

184. As a result, the Exchange Act Defendants, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

185. As set forth above, Novan violated Section 10(b) of the Exchange Act. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct and culpable participation, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with Novan, and to the same extent as Novan is liable to Plaintiff and the other members of the Class. Novan exercised control over the Individual Defendants and all of its employees and, as a result of its aforementioned conduct and culpable participation, is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiff and the other members of the Class.

186. By reason of the foregoing, the Exchange Act Defendants violated Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as a Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff rescission or a rescissory measure of damages;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

E. Awarding Plaintiff and other members of the Class such other and further relief, including any injunctive or other equitable relief, that may be deemed just and proper by the Court.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: April 30, 2018

McDANIEL & ANDERSON, L.L.P.
L. BRUCE McDANIEL (NC State Bar No. 5025)

*s/ L. Bruce McDaniel*
L. BRUCE McDANIEL

Lafayette Square
4942 Windy Hill Drive
Raleigh, NC 27609
Telephone: 919/872-3000
919/790-9273 (fax)
mcdas@mcdas.com

*Liaison Counsel*

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
ROBERT J. ROBBINS
BAILIE L. HEIKKINEN
CONSTANTINE P. ECONOMIDES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
bheikkinen@rgrdlaw.com
ceconomides@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101 (fax)
michaelf@johnsonfistel.com

*Attorneys for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 30, 2018.

McDANIEL & ANDERSON, L.L.P.
L. BRUCE McDANIEL (NC State Bar No. 5025)

*s/ L. Bruce McDaniel*
L. BRUCE McDANIEL

Lafayette Square
4942 Windy Hill Drive
Raleigh, NC 27609
Telephone: 919/872-3000
919/790-9273 (fax)
mcdas@mcdas.com

*Liaison Counsel*