IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN RE NOVAN, INC., SECURITIES LITIGATION | ) ) ) ) ) ) | 1:17CV999 |

MEMORANDUM OPINION AND RECOMMENDATION

This is a consolidated putative federal securities class action on behalf of all persons who purchased or acquired the stock of pharmaceutical company Novan, Inc. between September 21, 2016 (the date of Novan's initial public offering), and January 26, 2017.[1] In their Consolidated Amended Complaint [Doc. #44], Plaintiffs seek to recover under Section 11, Section 12, and Section 15 of the Securities Act of 1933 ("the 1933 Act") (15 U.S.C. § 77a et seq.), and under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 ("the 1934 Act") (15 U.S.C. § 78a et seq.), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The 1933 Act regulates the public offering of securities, and "protects investors by ensuring that companies issuing securities . . . make a full and fair disclosure of information relevant to a public offering." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1323 (2015) (internal quotation omitted). Sections 11 and 12 of the 1933 Act prohibit materially false statements and omissions in the Registration Statement and Prospectus, and Section 15 imposes individual liability on certain individuals for any such

[1] By Order dared April 6, 2018, this case was consolidated with Stefenowicz, et al. v. Novan Inc., et al., 1:17CV1015, and Cisneros v. Novan, Inc., et al., 1:17CV1066. Unless otherwise noted, all docket citations are to the record in Miriyala, et al. v. Novan, Inc., et al., 1:17CV999.

violation. The 1934 Act regulates the trading of securities after the initial public offering, and seeks to prevent deceptive practices in connection with the purchase and sale of securities. Under Section 10(b), it is "unlawful for any person to commit fraud in connection with the purchase or sale of securities." Plymouth Cnty. Retirement Ass'n v. Primo Water Corp., 966 F. Supp. 2d 525, 539 (M.D.N.C. 2013) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5). Section 20(a) similarly imposes individual liability on certain individuals for such a violation.

In this case, the Complaint alleges that Novan and its Officers, Directors, and Underwriters,[2] are liable based on alleged false statements and omissions made about the Company's leading drug candidate in connection with an initial public offering of its stock and in the weeks thereafter. Novan and its named Officers and Directors have filed a Motion to Dismiss [Doc. #47], contending that Plaintiffs have failed to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Underwriter Defendants have joined in that request in a separate Motion to Dismiss [Doc. #50]. For the reasons set forth below, the Court finds that Plaintiffs have failed to plausibly allege any materially false or misleading statement or omission, and the Court recommends that Defendants' Motions to Dismiss be granted.

---

[2] Plaintiffs assert their claims against (1) Novan, Inc.; (2) Nathan Stasko, who was president and chief executive officer of Novan, and Richard Peterson, who was chief financial officer of Novan (the Officer Defendants); (3) Novan Directors Robert A. Ingram, W. Kent Geer, Robert J. Keegan, G. Kelly Martin, Sean Murphy, and John W. Palmour (the Director Defendants); and (4) the Underwriters of the initial public offering: Piper Jaffray & Co., JMP Securities LLC, and Wedbush Securities Inc. (the Underwriter Defendants).

## I. FACTS, CLAIMS, AND PROCEDURAL HISTORY

According to the Complaint, Novan is a clinical-stage drug development company that focuses on the development and commercialization of nitric oxide-based therapies in dermatology. (Compl. [Doc. # 44] ¶ 2.) At issue here is the development of SB204, a topical gel for the treatment of acne, and an initial public offering of Novan stock. (Id. ¶ 3). Novan sold 4,715,000 shares of common stock in an initial public offering (IPO) on September 21, 2016, at $11.00 per share. (Id. ¶¶ 1, 45.) Novan's IPO documents included a Prospectus and a Registration Statement filed with the Securities and Exchange Commission (SEC) in connection with the IPO. Plaintiffs contend that the Prospectus and Registration Statement, and a subsequent press release and quarterly filing, included material misrepresentations and omissions regarding the clinical trials of SB204, and that as a result of the misrepresentations and omissions, Novan's outlook and expected financial performance were not accurately represented to the market, as further set out below.

As background, the Complaint includes a detailed description of the process for obtaining approval of drugs such as SB204 from the U.S. Food & Drug Administration ("FDA") prior to sale. (Id. ¶ 83.) According to the Complaint, the approval process requires clinical testing in three or four sequential phases. Phase 1 typically involves the introduction of the drug into healthy human subjects with the target condition to test for safety and other factors. In Phase 2, the drug is administered to a limited patient group to identify possible adverse effects and to preliminarily evaluate the efficacy of the drug. In Phase 3, relevant here,

the drug is administered to an expanded population, at geographically disbursed clinical trial sites, to generate enough data to statistically evaluate the efficacy and safety of the product, to establish an overall risk-benefit profile, and to gather adequate information for the labeling of the product. (Id. ¶ 84).

In the case of SB204, the Phase 2 trials showed statistically significant reductions in patient lesions. Novan then prepared for Phase 3 Trials. (Id. ¶¶ 92, 96, 97.) Prior to commencing the Phase 3 Trials, Novan officials met with the FDA and submitted to the FDA its protocols for the Phase 3 program under a special protocol assessment ("SPA") designed to facilitate the FDA's review and approval of the drug. (Id. ¶¶ 49, 98.) According to Plaintiffs, during this process initiated by a drug developer such as Novan, the FDA can evaluate the Phase 3 study protocol and respond to questions. (Id. ¶ 98.) Plaintiffs contend that during these conversations the FDA "advised Novan to study the effect of SB204 on women who were also taking oral contraceptives with acne indication – i.e., oral contraceptives that are also FDA-approved acne treatments. The FDA also advised the Company that Novan should separately report the data from those specific study participants." (Id. ¶ 99.)

Novan instituted two Phase 3 trials, designated as NI-AC301 and NI-AC302. According to Plaintiffs, both Phase 3 trials were labelled as randomized and double-blinded, had identical enrollment targets of 1,300 patients to be randomly assigned to one of the two groups, were labelled as having the same primary and secondary endpoints (to measure efficacy) and the same eligibility criteria (inclusion and exclusion), and were listed on a publicly

accessible website with directions that participants in the trials be willing to not use other acne treatment. (Id. ¶¶ 103-06.) In both trials, administrators assigned participants to one of the following categories: 0 (clear), 1 (almost clear), 2 (mild severity), 3 (moderate severity) and 4 (severe). To be a "success," a participant needed a final score of 0 or 1 and improvement of at least 2 points. (Compl. ¶ 119.) While the Phase 3 trials were ongoing, Novan issued a press release and a Quarterly Statement 10-Q, providing various updates, and repeating certain descriptions of the trials included in the Registration Statement and Prospectus.

On the morning of January 27, 2017, Novan reported the results of the Phase 3 Trials, reflecting that SB204 demonstrated statistical significance on all three co-primary endpoints in the 302 Trial, but demonstrated statistical significance on only one of the three co-primary endpoints in the 301 Trial. (Compl. at ¶ 123.) In its press release announcing the results, Novan indicated that it was pleased with the results of the 302 Trial but was disappointed with the results of the 301 Trial, and noted that it had not received the full data set and intended to provide a further update after complete analysis of the results. (Compl. at ¶ 125.) When the market opened, the value of Novan's shares fell, from $18.70 the prior evening to $4.50 per share at opening, and closing at $4.86 per share that day. (Compl. at ¶ 126.) Over a month later, on March 6, 2017, Novan's CEO, Defendant Stasko, hosted a conference call with investors. During the call, Defendant Stasko discussed the Phase 3 Trials, including the FDA's suggestion to separately report data regarding women on oral contraceptives with an acne indication, the fact that while the enrollment criteria excluded patients on other oral and topical

acne treatment it did not exclude women on oral contraceptives with an acne indication, and the fact that the 301 Trial had a larger number of participants with severe acne on the actual drug (14.7% in Trial 301 and 9.7% in Trial 302). (Compl. ¶ 127.) Defendant Stasko indicated that Novan had identified several aspects of a well-controlled trial design that he believed would increase the chance for success in future studies. (Compl. ¶ 128.) On March 22, 2017, Novan's Chief Financial Officer resigned, and on May 5, 2017, Novan's Chief Medical Officer resigned. (Compl. ¶¶ 144, 146.) On June 5, 2017, Defendant Stasko transitioned from his role as CEO to President and Chief Scientific Officer. (Compl. ¶ 149.)

The Complaint alleges that Novan's Prospectus, Registration Statement, Quarterly Report, and earlier press release failed to disclose the details regarding the FDA's suggestion that Novan separately report data regarding women on oral contraceptives with an acne indication. However, in their Motions to Dismiss, Defendants contend that there was no need to include that level of detail regarding the discussions with the FDA, and that the failure to include those details did not render the documents false or misleading. Plaintiffs also contend that the Prospectus, Registration Statement, Quarterly Report, and earlier press release included misrepresentations to the extent the documents stated that Novan had commenced two "identically designed" Phase 3 clinical trials. Plaintiffs contend that this statement is false because the two trials were not ultimately identical, in that the 301 trial included participants with significantly more severe acne than the 302 trial, and the 301 trial included 14 women who were taking oral contraceptives with an indication for acne.

However, in the Motions to Dismiss, Defendants note that there was no misrepresentation because, as Plaintiffs themselves allege, the trials were identical in their criteria and design, and the fact that one trial ended up with a different mix of participants does not mean there was any difference of design. Plaintiffs contend that Defendants' materially misleading statements and omissions, particularly the failure to disclose that the 301 Trial and 302 Trial were not identical and the failure to disclose the FDA's suggestion that Novan track the data for women on oral contraceptives with an acne indication, caused the drop in Novan's stock. (Compl. ¶ 131.) These contentions and the specific challenged statements are set out in greater detail below.

## II. DISCUSSION

### A. Standard for Motion to Dismiss

A plaintiff fails to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Thus, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." Twombly, 550 U.S. 544, 555, 570 (2007). "The court 'need not

accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 615 n.26 (4th Cir. 2009) (quoting Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (internal quotation marks omitted)).

In addition, cases involving allegations of fraud are subject to the pleading standards under Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") also imposes heightened pleading standards for pleading falsity and the required scienter for Section 10(b) claims. Zak v. Chelsea Therapeutics Int'l Ltd., 780 F.3d 597, 606 (4th Cir. 2015). The PSLRA was enacted "to prevent Securities Exchange Act claims from bring 'employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.'" Singer v. Reali, 883 F.3d 425, 439 (4th Cir. 2018) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 2501, 168 L. Ed. 2d 179 (2007).

> These heightened pleading standards exist because Congress recognized the potential for abuse in the securities fraud context, including 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.' Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). The requirement of heightened pleading reflects Congress' view that courts should 'be vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation.' Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir.2008).

Plymouth County Retirement Ass'n v. Primo Water Corp., 966 F. Supp. 2d 525, 538 (M.D.N.C. 2013).

If a plaintiff alleges that a defendant made false or misleading statements or omissions, the PSLRA requires that the plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "In determining if the complaint satisfies the pleading standards of the PSLRA, the court will assess the complaint as a whole. As such, the court will evaluate the number and level of detail of the facts, the plausibility and coherency of the facts, the sources of the facts and the reliability of those sources, and any other criteria that can be used to inform how well the facts support Plaintiffs' allegations." Plymouth County Retirement, 966 F. Supp. 2d at 539. In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "If those exacting pleading requirements are not satisfied, the complaint must be dismissed." Singer, 883 F.3d at 439 (citing Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008)).

B. Plaintiffs' Claims under Section 10(b) of the 1934 Act

Section 10(b) and SEC Rule 10b-5 make it unlawful for any person to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To state a claim for a violation of Section 10(b), a plaintiff must establish: "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); Singer, 883 F.3d, at 438. To establish a false statement or omission "plaintiffs must point to a *factual* statement or omission – that is, one that is demonstrable as being true or false," and "the statement must be *false* or the omission must render public statements *misleading*." Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999). With respect to omissions, the Supreme Court has observed that Section 10(b) and SEC Rule 10b-5 "do not create an affirmative duty to disclose any and all material information" and disclosure of material information is required by Section 10(b) "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (internal quotation and citation omitted). "The court must consider whether the statements or omissions, when read as a whole, would have misled a reasonable investor." Hirtenstein v. Cempra, Inc. No. 1:16CV1303, 2018 WL 5312783 at *15 (M.D.N.C. Oct. 26, 2018) (Schroeder, C.J.). The statement or omission must also be material, and a fact is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by the disclosure of the fact." Longman, 197 F.3d at 683.

Finally, with respect to the scienter element, a plaintiff must show that a defendant possessed "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319 (internal quotations omitted). A plaintiff may meet this requirement by pleading recklessness. Matrix Capital Management Fund, LP v. Bearing Point, Inc., 576 F.3d 172, 181 (4th Cir. 2009). For purposes of Section 10(b), a reckless act is "one so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (internal quotations omitted). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The inference must be "compelling, persuasive, effective and powerful." Cozzarelli, 549 F.3d at 624 (internal quotation omitted). As the Fourth Circuit explained, "when the facts as a whole more plausibly suggest that the defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed." Id.

1. Alleged Misstatements and Omissions

Plaintiffs contend that Defendants violated Section 10(b) based on alleged misstatements and omissions in the Registration Statement, Prospectus, a subsequent press release, and a Form 10-Q. Plaintiffs further contend that the documents are false or misleading, based on the information provided in the corporate telephone conference that

took place after the release of the results of the Phase 3 trials. In considering a Rule 12(b)(6) motion to dismiss a § 10(b) action, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, 551 U.S. at 322. Therefore, the Court sets out below the relevant excerpts from the documents at issue, with emphasis on the portions particularly at issue.[3] After setting out the specific documents and statements at issue, the Court will consider Plaintiffs' contentions that the documents (1) were misleading by failing to disclose details regarding the FDA's suggestion that Novan separately report data regarding women on oral contraceptives with an acne indication and (2) misrepresented that the trials were identically designed because (a) the 301 trial included participants with significantly more severe acne than the 302 trial, and (b) the 301 trial included 14 women who were taking oral contraceptives with an indication for acne.

---

[3] As recently noted in Hirtenstein v. Cempra, Inc., 2018 WL 5312783,

> Even though matters outside the pleadings are generally not considered on a Rule 12(b)(6) motion, see Fed. R. Civ. P. 12(d); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004), "the court can consider 'documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice' without converting a motion to dismiss into one for summary judgment." Plymouth Cty. Ret. Ass'n v. Primo Water Corp., 966 F.Supp.2d 525, 536 (M.D.N.C. 2013) (quoting Sun Chem. Trading Corp. v. CBP Res., Inc., No. 1:01CV00425, 2004 WL 1777582, at *3 (M.D.N.C. July 29, 2004)). "Courts may consider documents attached to a motion to dismiss 'so long as they are integral to the complaint and authentic.' " Id. (quoting Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)); Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606–08 (4th Cir. 2015); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–67 (4th Cir. 2016). "[I]n a securities fraud case, the court may consider 'public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint.' " Plymouth, 966 F.Supp.2d at 536–37 (quoting In re Royal Ahold N.V. Secs. & ERISA Litig., 351 F.Supp.2d 334, 349 (D. Md. 2004)).

The Registration Statement

As is relevant to Plaintiffs' claims in this case, the Registration Statement stated as follows:

> Our lead product candidate is SB204, a cosmetically elegant topical gel that targets multiple mechanisms of action for the treatment of acne vulgaris, the most common skin disease in the United States. We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017.
>
> ***
>
> We designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our NDA [new drug application] for SB204 to the FDA by the end of 2017.
>
> ***
>
> We currently do not have an SPA in place with respect to any of our product candidates. We have previously made such a submission for an SPA to the FDA in connection with the design of our Phase 3 clinical trials for SB204. We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA. We recognized that the feedback obtained in connection with the SPA discussions does not constitute a formal SPA or a binding declaration from the FDA that it agrees with the Phase 3 clinical trials' design, clinical endpoints or statistical analysis plan.

(Compl. at ¶¶ 47-49; Def. Ex. 1 [Doc. #49-1 at 6, 8, 22-23].)[4]

---

[4] The Court takes judicial notice of the Registration Statement available at: https://www.sec.gov/Archives/edgar/data/1467154/000119312516713804/d233787ds1a.htm and has quoted from that document. The Court notes that the Registration Statements contains numerous warnings to potential investors, including that:

The Prospectus

With respect to the excerpts highlighted by Plaintiff, Novan's Prospectus stated as follows:

> We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017.
>
> ***

---

> *Drug development involves a lengthy and expensive process with uncertain outcomes, and results from earlier studies and trials may not be predictive of future trial results.*
> Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure or delay can occur at any time during the clinical trial process. Success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful. A number of companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in clinical trials, even after promising results in earlier preclinical studies or clinical trials. . . . Product candidates in later stages of clinical trials may fail to show the required safety profile or meet the efficacy endpoints despite having progressed through preclinical studies and initial clinical trials. Notwithstanding any potential promising results in earlier testing, we cannot be certain that we will not face similar setbacks. Even if our clinical trials are completed, the results may not be sufficient to obtain regulatory approval for our product candidates. We have completed Phase 2 studies of SB204 and initiated our Phase 3 trials in the first quarter of 2016. . . . [W]e cannot be certain that the trials or any other future clinical trials for our product candidates will begin on time, need to be redesigned, enroll an adequate number of patients on time, or be completed on schedule, if at all.

(Registration Statement at 12 [ECF Doc. #49-1 at 17].) The Registration Statement further noted that Novan had "*never conducted a Phase 3 clinical trial before, and may be unable to successfully do so for any of our product candidates*." (Id.) The Registration Statement also explained that

> In the first quarter of 2016, we initiated two identically designed Phase 3 pivotal clinical trials for our lead product candidate, SB204 to treat acne vulgaris, and we expect to report top-line results in the first quarter of 2017. These trials are designed to further evaluate the safety and efficacy of SB204 in 2,600 patients with acne vulgaris. Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submitting our NDA to the FDA for SB204 by the end of 2017.
>
> ***
>
> We have completed an end-of-Phase 2 meeting with the FDA and submitted the protocols for the Phase 3 program under a special protocol assessment, or SPA, for review by the FDA. We have reached an agreement with the FDA on the primary endpoints for our Phase 3 clinical trials, but do not intend to pursue a full formal SPA agreement with the FDA.

(Registration Statement at 84, 91.)

> We designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our NDA for SB204 to the FDA by the end of 2017.
>
> ***
>
> We currently do not have an SPA in place with respect to any of our product candidates. We have previously made such a submission for an SPA to the FDA in connection with the design of our Phase 3 clinical trials for SB204. We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA. We recognize that the feedback obtained in connection with the SPA discussions does not constitute a formal SPA or a binding declaration from the FDA that it agrees with the Phase 3 clinical trials' design, clinical endpoints or statistical analysis plan. We may, in the future, decide to make a submission for an SPA for any of our current or future product candidates.

(Compl. ¶ 47, ¶ 50; Prospectus)[5]

Press Release / Form 8-K

Plaintiffs also point to a November 14, 2016, press release announcing Novan's financial results for the quarter ended September 30, 2016. The press release was submitted on a Form 8-K and stated that

> Novan is developing: SB204 for the treatment of acne vulgaris, or acne. The Company announced Sept. 28, 2016, that the two identically designed Phase 3 pivotal clinical trials for SB204 were fully enrolled ahead of schedule. Novan expects to announce top-line results from these parallel pivotal trials in the first quarter of 2017. Assuming successful completion of these Phase 3 pivotal trials and the long-term safety study, the Company is targeting submission of a new

[5] The Court takes judicial notice of the Prospectus available at: https://www.sec.gov/Archives/edgar/data/1467154/000119312516717193/d233787d424b4.htm. The Prospectus also included similar warnings and a discussion of the risk factors, as set out previously.

> drug application for SB204 to the U.S. Food and Drug Administration by the end of 2017.
>
> ….
>
> This press release contains forward-looking statements including, but not limited to, statements related to pharmaceutical development of nitric oxide-releasing product candidates and future prospects. Forward-looking statements are subject to a number of risks and uncertainties that could cause actual results to differ materially from our expectations, including, but not limited to, our ability to succeed in redeploying our resources if our nitric-oxide releasing platform in dermatology fails to meet our expectations; the length and expense of the clinical development process with uncertain outcomes, where results of earlier trials may not be predictive of results of later trials ….

(Id. ¶ 133; Def. Ex. 2 [Doc. #49-3 at 7].)

Form 10-Q

Plaintiffs also rely on Novan's Form 10-Q (a quarterly report required to be filed with the SEC) for the third quarter of 2016, filed on November 14, 2016. According to the Form 10-Q[6]:

> In the first quarter of 2016, we commenced two identically designed Phase 3 pivotal clinical trials of SB204 to evaluate safety and efficacy. We completed enrollment in both trials ahead of schedule by randomizing the last patient in September 2016, bringing the total number of enrolled patients to 2,600. Per the study protocol, the last patient randomized will be treated for 12 weeks. We expect to report top-line results from the two parallel trials in the first quarter of 2017. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our new drug application, or NDA, for SB204 to the U.S. Food and Drug Administration, or the FDA, by the end of 2017.

(See Compl. ¶ 134; Def. Ex. 3 [Doc. #49-4 at 6].) The Form 10-Q also included similar cautionary language.

[6] The Form 10-Q is found at https://www.sec.gov/Archives/edgar/data/1467154/000156459016029287/novn-10q_20160930.htm.

Corporate Telephone Conference

On March 6, 2017, Novan hosted a conference call with investors. Plaintiffs rely on this conference call as the basis for alleging that investors became aware of misrepresentations and omissions in the earlier statements. (Id. ¶ 127). From the quoted allegations in the Complaint, and the transcript provided by Defendants, the following information was provided to investors:

> [Defendant Staskos] -
>
> SB204 demonstrated statistical significance with a P value less than 0.05 compared to vehicle on all 3 co-primary endpoints in the NI-AC302 trial . . . but demonstrated statistical significance on only 1 of the 3 co-primary endpoints in the other trial, AC301 or the 301 trial.
>
> At the time of the release, we had not received the full data set from the Phase III trial to enable the company to provide guidance on the next steps of our SB204 program, but our team committed to a complete analysis of the data and thorough review of the study conduct and to providing you all a new subsequent update once that analysis was substantially complete. Over the past 5 weeks, we have carefully investigated sensitivity and subset analyses, consulted with third-party experts in regulatory affairs and biostatistics and conducted a robust post trial review of the quality and integrity of the investigational product throughout the supply chain, from manufacturing of the active ingredient all the way to dispensing to the patient.
>
> A number of specific findings from this analysis are particularly noteworthy. The magnitude of effect observed with SB204 against inflammatory and non-inflammatory lesions was consistent across both Phase III trials. And with the reductions we observed in our previous Phase IIb trial, there was no loss in potency or reduction in clinical benefit for acne participants in the Phase III program. While our enrollment criteria did exclude patients in other oral and topical treatment, it did not exclude women on oral contraceptive prescriptions that have an acne indication. We believe that this was a contributor to the reduced separation on inflammatory lesions between active and vehicle in the 301 trial.

The 301 trial also enrolled a larger number of patients with severe acne, specifically 14.4% versus 9.7% in the 302 trial, which we believe contributed to reduced IgA success in patients treated with SB204 and the 301 trial missing on that endpoint. It should be noted that it's remarkably difficult for a severe to move to clear or almost clear, which would constitute a 3 or 4 grade change on the IgA scale.

***

Next steps. Novan is planning to discuss the entirety of the SB204 development program with the FDA in the third quarter of 2017 as part of our planned pre-submission meeting. Following our pre-NDA meeting, we intend to finalize plans to initiate any additional clinical trials necessary to support the approvability of SB204. We are currently expecting to need one additional clinical trial to measure, among other things, the absolute reduction in inflammatory and non-inflammatory lesions and IgA success. . . . .

As part of Novan's thorough review of the 301 and 302 trial conduct, management has identified several aspects of a well-controlled trial design that we believe will increase the chance for success in future studies and substantively reduce the number of patients required to meet statistical significance on the co-primary endpoints.

***

The percentage of subjects in the active arm of the 301 study with baseline score of severe was 14.4% versus 9.7% in the active arm of the 302 study. That's 30 more subjects with severe acne in the 301 study than in the 302 study, whereas the vehicle arms across the 2 trials were consistent with 11.9% and 11.6% severes at baseline, respectively. We believe this may have had an impact on the reduced IgA success and subjects treated with SB204 in the 301 trial.

***

Looking at the data for the 301 and 302 studies in a modified intent-to-treat analysis that excludes women on oral contraceptive prescriptions that have an acne indication, these would be products like Yaz or Ortho Tri-Cyclen, there were statistically significant reductions of both inflammatory and noninflammatory lesions in each trial. As I mentioned earlier, we believe the

inclusion of these women on birth control contributes to the reduced separation from vehicle in the 301 trial observed for inflammatory lesion in our primary analysis.

The inflammatory lesion measure becomes statistically significant by removing only 14 patients from the 301 dataset, 8 on SB204 and 6 on vehicle. As part of our Special Protocol Assessment, the FDA had encouraged the company to run our analyses both with and without women on oral contraceptive prescriptions with an acne indication and to report the data separately. Whether or not this subset of patients will be included in future trials will be one of our topics for discussion with the FDA at our pre-NDA meeting.

***

Q: Next question is regarding the Phase II – I mean, the 301, the 302 and the follow-up clinical trial. Were there a different number of protocol violations in 301 versus 302? And how do you think you can change your inclusion criteria? I mean, can you run a trial and exclude women on birth control pills? Or can you – how do you preselect so that you have a similar number of severe acne patients in your active and control arm?

A: I think each of those are factors that we look forward to discussing with the FDA at the pre-NDA meeting and will be components of our future trial design. On the severe question first, we could potentially stratify the number of severes equally between the active and the vehicle treatment groups such that there's not an imbalance. The women on oral contraceptives with an acne indication, based on the data that we have in hand, that's – again, as I mentioned, we will discuss that with the agency. And then there are a couple of other variables, as I mentioned, the baseline disease severity, the number of lesions and particularly where you are on that disease spectrum that we believe we could tighten and have a much better well-controlled population of acne as we look at future trials.

***

Q: So in the analysis where you're excluding women on oral contraceptives, just curious, were those women on oral contraceptives? Were they mainly 3s or 4s at baseline?

A: [Defendant Staskos] I would say that there wasn't anything that stood out based on their severity. And I would – based on the overwhelming number of

> moderates, I would predict that they were more moderate, and it was very few subjects in each of the treatment arms. They had to be on a stable regimen of oral contraceptives prior to enrolling in the study for at least 3 months. So we did not anticipate a tremendous amount of variability. But the magnitude of lesion changes, particularly on inflammatory in the trial, were large.

(Def. Ex. 4, Decl. of Watts [Doc. #49-5 at 4-7, 10-11]); Compl. ¶¶ 127-29).

2. Contention That Defendants' Omission of FDA Discussions Was Misleading

Plaintiffs contend that Novan failed to timely disclose that the "FDA had encouraged the company to run our analyses both with and without women on oral contraceptive prescription[s] with an acne indication and to report the data separately." (Compl. at ¶ 127.) Plaintiffs believe that earlier disclosure of this information was necessary because Novan reported in its Offering Documents that the protocol for the Phase 3 trials was designed "based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-phase-2 meeting in September 2015." Plaintiffs further noted the additional statements in the Offering Documents that, "We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA." As reflected in their Response Brief, Plaintiffs contend that these statements were misleading because "[o]nce Defendants touted the Trials' design as being based on FDA feedback, they were obliged to disclose in the Offering Documents that the FDA had advised Novan to study the efficacy of SB204 in women on oral contraceptives with an acne indication and separately report the data on those participants." (Pl. Resp. Br. at 19 [ECF Doc. #52 at 26].)

However, in the Offering Documents, Novan represented that it met with the FDA in advance of the Phase 3 trials, that it received feedback, that its Phase 3 trial design was based upon that feedback, that the feedback did not constitute a binding agreement that the FDA agreed with the trials' design (apart from endpoints), and that Novan believed the feedback was sufficient to move forward on its Phase 3 development program. That the FDA encouraged Novan to separately analyze the results as to a group of women on oral contraceptives does not impact the truth or falsity Novan's statements nor does it suggest that the FDA was critical of the efficacy of the drug or the drug trials. Plaintiffs' premise requires the Court to accept a series of attenuated, unsupported inferences, including that the FDA's comments were something more than a suggestion for tracking results as appears on its face, and that Novan did not have a reasonable belief that it could proceed in the face of the comments.

The cases cited by Plaintiffs do not lead this Court to a different conclusion. Novan's statement is not contradicted by, nor called into question by the fact that the FDA encouraged it how to report and analyze data from the trials. See In re Medimmune, Inc., Sec. Litig., 873 F. Supp. 953, 966 (D. Md. 1995) ("mere questioning . . . imposed no duty upon Defendants to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose" and "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process"). Nor were affirmative statements made that suggest Defendants were minimizing any actual concerns by

the FDA. See Singer, 883 F.3d at 440 (finding a duty to disclose a fraudulent reimbursement scheme after the company had made numerous affirmative misstatements and omissions regarding its practices and attempted to downplay to investors the financial consequences of its fraudulent scheme); Zak v. Chelsea Therapeutics, Int'l., Ltd., 780 F.3d 597, 609-10 (4th Cir. 2015) (holding that a representation that the FDA 'agreed' the company could submit a new drug application without the need for further studies was misleading in light of the FDA's "continuing expectation that two successful efficacy studies would be required"). "Furthermore, in a series of cases, courts have rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review." In re Sanofi Securities Litigation, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (collecting cases). Here, Novan disclosed that the FDA provided "feedback" with respect to the Phase 3 trial design that Novan "believed was sufficient to move forward on the Phase 3 development program," and Novan further disclosed that the feedback obtained did not constitute an agreement that the FDA "agrees with the Phase 3 clinical trials' design, clinical endpoints or statistical analysis plan." (Registration Statement at 18 [ECF Doc. #49-1 at 23].) These statements were in addition to the Company's more general risk disclosures. The Court concludes that Plaintiffs have not alleged any basis to conclude that the statements were false, nor is there any basis to find that they required further clarification to render them not misleading.

3. Contention of False Statement That Phase 3 Trials Were Identical

Plaintiffs next contend that Novan falsely represented that the two Phase 3 trials were "identical," when they were not. (See e.g., id. ¶¶ 51(a), 135(a), (b).) However, the actual language in the Company's statements is not that the trials were "identical" but that there were "two *identically designed* Phase 3 pivotal clinical trials." (Id. ¶¶ 47, 48, 50, 102, 133, 134) (emphasis added). Plaintiffs contend that the two Phase 3 trials were not identical for two reasons. First, Plaintiffs contend that Trial 301 had a disproportionate number of patients with severe acne that could not be accounted for by random chance, and second, Plaintiffs allege that Trial 301 "included a specific patient population – women on oral contraceptive prescriptions" (id. ¶ 51(a)) that was not present in 302. (Compl. ¶ 135(a) and (b).)

As to both claims, Defendants explain that FDA regulations require a drug's sponsor to submit an application containing, inter alia, protocols for the planned study, and Defendants note that these protocols are synonymous with a trial's design. (Defendants' Memorandum of Law in Support at 12-13 [ECF Doc. #48 at 19-20]; see 21 C.F.R.§ 312.23(a)(6)(iii)). Defendants contend that the Complaint refers to the FDA's protocols, reflecting that both trial groups had identical "objectives and purpose of the study" (Compl. ¶ 103), identical "criteria for patient selection and for exclusion," (id. ¶ 105), an identical estimate of the number of patients to be included in the study (id. ¶ 104), an identical "description of the observations and measurements to be made to fulfill the objectives of the study [endpoints]" (id. ¶ 103), the same "description of the design of the study, including the kind of control group to be used, if any, and a description of methods to be used to minimize bias on the part

of subjects, investigators, and analysts," and the same drug dosages. 21 C.F.R. § 312.23(a)(6)(iii); See Compl. ¶¶ 103, 104, 105.) Defendants contrast this with the design of the Phase 2 trials, having design differences including measuring different endpoints and different drug dosages. (Id. ¶¶ 87, 89, 93, 94.)

(a) Alleged Differences Based on Acne Severity

The first alleged difference between the two Phase 3 Trials is the baseline acne severity of the participants. Plaintiffs allege that the two Phase 3 trials were not identical because, after-the-fact, Plaintiffs learned that more participants with severe acne placed in 301 (13.2% of the population) than in the 302 (10.6%) trial. (Compl. ¶ 120; Pl. Resp. Br. at 7 [ECF Doc. #52 at 14].) Plaintiffs' allegations here start and end with the statistical conclusion that "there was a 95.6% probability that distinct differences between the administration of NI-AC301 and NI-AC302 - rather than chance - caused the divergent baseline IGA scores." (Id.) Based upon the probability, Plaintiffs allege that "Defendants knew or recklessly disregarded that there was a statistically significant and material difference between the participants' baseline IGA scores in the two studies, thus rendering the studies non-identical." (Compl. ¶ 122.) However, Plaintiffs also allege that this statistical difference "indicates that when assigning IGA scores, the administrators in each study were either stricter or more liberal than their counterpart study administrators in the other study" and therefore the studies "were **not** identically designed." (Compl. ¶ 121) (emphasis in original). Thus, Plaintiffs' factual allegations focus on how the trials were administered, rather than any design differences.

Plaintiffs do not contend that the trials do not meet the design protocols established by the FDA, nor is there any alternative contention apart from the fact that the mix of participants in the 301 Trial was not identical to the 302 Trial.

Plaintiffs do not allege any difference in trial design as to the inclusion of participants based on severity, or otherwise refute that the FDA protocols for the two trials were equivalent. Rather, Plaintiffs contend that the Company's March 6, 2017, conference call discussing the results of the Phase 3 trials reflects that the trials were not "identical." However, neither Defendant Staskos' published remarks, nor any reasonable inferences that can be drawn from those remarks, reflect that the Phase 3 trials were not identically designed. Indeed, the remarks actually reflect that "the percentage of subjects in the <u>active</u> arm of the 301 study with baseline score of severe was 14.4% versus 9.7% in the active arm of the 302 study. That's 30 more subjects with severe acne in the 301 study than in the 302 study, whereas the vehicle [placebo] arms across the 2 trials were consistent with 11.9% and 11.6% severes at baseline, respectively." (Def. Ex. 4, Decl. of Watts [Doc. #49-5 at 4-7].) Thus, the record relied upon by Plaintiffs actually reflects that the number of subjects rated as "severe" was the same in both studies on the placebo, but with a disproportionate number of subjects rated as "severe" on the active drug in the 301 Trial compared to the 302 Trial. Given the blinded nature of the studies, it is not clear how this could possibly be the result of a design difference, or otherwise create any basis to conclude that the Trials were not "identically designed" as Novan represented.

Ultimately, Plaintiffs' real contention appears to be that the design of the trials did not appropriately judge the efficacy of the drug in subjects rated as "severe" because "participants with beginning IGA scores of 4 (severe) would have to improve by at least 3 points (from 4 to 1) to be successes, whereas participants with beginning IGA scores of 3 (moderate severity) needed only to improve by 2 points (from 3 to 1) to be successes." (Pl. Resp. Br. [Doc. #52] at 14.) This is, in hindsight, a reasonable criticism. Indeed, Defendant Stasko acknowledged this issue in the March telephone conference, and noted that future trial designs "we could potentially stratify the number of severes equally between the active and the vehicle treatment groups such that there's not an imbalance. . . . And then there are a couple of other variables, as I mentioned, the baseline disease severity, the number of lesions and particularly where you are on that disease spectrum that we believe we could tighten and have a much better well-controlled population of acne as we look at future trials." (Def. Ex. 4, Decl. of Watts [Doc. #49-5 at 10].) However, Plaintiffs may not utilize securities litigation to second guess the decisions by scientists and company officials in how they approached the clinical trials, as further discussed below, and Plaintiffs have failed to plausibly allege any material misrepresentation in this regard.

(b) Alleged Differences Based on Women on Oral Contraceptives with an Acne Indication

Finally, Plaintiffs contend that Trial 301 and Trial 302 were not identical because Trial 301 included women on oral contraceptives with an acne indication. As noted above, however, Novan's documents did not represent that the trials were "identical." Indeed, no

two trials will produce an identical result. Oxford Asset Mngt., Ltd. v. Jaharis, 297 F.3d 1182, 1193 (11th Cir. 2002). Instead, the issue is whether Defendants misrepresented that the trials were "identically designed." As to this claim, Plaintiffs allege that the trials were not identically designed because the 301 Trial included women on oral contraceptives with an acne indication while the 302 Trial did not. However, as support for this statement, Plaintiffs rely solely on the March telephone conference with Defendant Stasko. Plaintiffs specifically point to Defendant Stasko's statement that "the inclusion of these women on birth control contributes to the reduced separation from vehicle in the 301 trial . . . . The inflammatory lesion measure becomes statistically significant by removing only 14 patients from the 301 dataset." (Compl. ¶ 127; Pl. Resp. Br. at 16 [ECF Doc. #52 at 23].) Plaintiffs argue that Defendant Staskos' comments during the conference call constitute an effective concession that no group of women taking oral contraceptives containing an acne medication were placed into the 302 Trial and therefore the trials were not identically designed. However, the statement, in context, immediately follows a statement discussing the review of data from *both* the 301 and 302 trials. Specifically, as noted above, Defendant Stasko noted that, "Looking at the data for the 301 and 302 studies in a modified intent-to-treat analysis that excludes women on oral contraceptive prescriptions that have an acne indication . . . there were statistically significant reductions of both inflammatory and noninflammatory lesions in each trial." Thus, the very document on which Plaintiffs rely specifically explains that women on oral contraceptive prescriptions that have an acne indication were included in each trial, both 301 and 302. In

addition, in subsequent answers to questions, Defendant Stasko noted that as part of their discussions with the FDA regarding future trials, they would discuss the possibility of excluding women on oral contraceptives. Ultimately, Defendant Stasko's statement cannot be reasonably taken to support the allegations in the Complaint that the 302 Trial excluded women on oral contraceptives. Defendant Stasko did not state that there was any such exclusion, his statement read as a whole actually reflects that both trials included women on oral contraceptives with an acne indication (with a larger number in the 301 Trial that potentially impacted the results), and Plaintiffs' claims of falsity are based only on speculation. Thus, the Complaint's allegations based on the telephone conference do not support a reasonable belief that Novan's prior representations were false or misleading. Thus, Plaintiffs have not set out a plausible claim, beyond unsupported inferences and speculation. Indeed, as noted above, the inferences Plaintiffs seeks to draw are not only unsupported but actually contradicted by the documents on which Plaintiffs rely.[7]

---

[7] The Court has considered whether it is necessary to allow narrow document discovery, specifically limited to the question of whether women on oral contraceptives with an indication for acne were, by design, excluded from participation in the 302 Trial. However, given the information set out above, there is simply no sufficient basis to warrant the burdens of discovery, even narrow discovery, in the circumstances presented. See Teachers' Ret. Sys. Of LA v. Hunter, 477 F.3d 162, 177 (4th Cir. 2007) (considering the factual allegations in the complaint and the underlying statements relied upon as the basis for those factual allegations, to determine if the allegations based on those statements would support a reasonable belief that the representations or omissions were misleading). As the Fourth Circuit noted in Cozzarelli, 549 F.3d at 624:

> These substantive elements of a securities fraud claim are demanding. But the potential liability for defendants also can be significant. As a result, there is a danger that some Exchange Act suits seek only valuable settlements and fees rather than success on the merits. Indeed, securities fraud actions, "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2504, 168 L.Ed.2d 179 (2007).
>
> To eliminate such abuse, Congress enacted the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737. See Tellabs, 127 S. Ct. at 2504. Through the "[e]xacting pleading

To the extent that Plaintiffs again note that the FDA encouraged Novan to separately report the impact of SB204 on women on oral contraceptives with an acne indication, Plaintiffs fail to credibly allege how this would impact the design criteria of the study, apart from how Novan analyzed and reported the data after the trial concluded. The Court is unable to discern a false statement under the pleadings standards applicable here.

Again, Plaintiffs' real complaint appears to be with the design of the trial, particularly the inclusion of women on oral contraceptives with an acne indication. As noted in Plaintiffs' Response Brief:

> The inclusion of women on birth control pills with an acne indication created substantial risk to the outcome of the Trials. The risk included the potential delay or denial of FDA approval of SB204, which was material to investors, and should have been disclosed in the Offering Documents. The inclusion of this patient population was even more important because these female participants still had acne even though they were already taking FDA-approved acne medications. Consequently, their acne symptoms had not previously responded to an FDA-approved acne treatment.

(Pl. Resp. Br. at 17.) In hindsight, it may have been better not to include "participants who had ostensibly proven resistant to prior FDA-approved acne treatments" (Pl. Resp. Br. at 17),

---

requirements" of the PSLRA, Congress charged courts to be vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation. Id. at 2504, 2508. In particular, Congress required that plaintiffs make specific allegations of false statements or else face dismissal. See 15 U.S.C. § 78u–4(b). And Congress instructed courts to dismiss any securities fraud complaint that does not "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. Id. § 78u–4(b)(2).

....

To sum up, Tellabs recognized that securities fraud actions serve an important purpose—but only when those actions are meritorious. See id. at 2504, 2509. The PSLRA balances these concerns by requiring courts to sort out the meritorious claims from the abusive ones early in litigation, and Tellabs obligates courts do so with care.

and as noted above, in the conference call, Defendant Stasko noted an intent to work with the FDA to consider ways to re-design future trials, including by potentially excluding women on oral contraceptives with an acne indication. However, the fact that the trial design could have been differently designed does not support the contention that any of Novan's representations were false or misleading.[8]

In the end, Plaintiffs' attack on Novan's representations regarding the Phase 3 trials "devolves into a disagreement" as to the quality and design of the trials, but such "criticisms do not rise to the level of a Section 10-b claim under the PSLRA." Plymouth County Retirement, 966 F. Supp. 2d at 545; see also Lerner v. Northwest Biotherapeutics, 273 F. Supp. 3d 573, 587-88 (D. Md. 2017) ("Plaintiffs' allegations do not explain how these shortcomings are not merely the difference between two permissible judgments, but rather the result of a falsehood. Simply alleging that defendants 'should have used different statistical methodology' in their clinical trials is not sufficient to allege falsity. Plaintiffs do not allege that Defendants falsely or inaccurately reported their conclusions; rather they seem to merely disagree with Defendants' methodology for reaching those conclusions. Indeed, where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study . . . The securities laws do not impose a requirement that companies

[8] Plaintiffs also contend that the focus on woman taking oral contraceptives with an acne indication required a sufficient sample size. (Compl. ¶¶ 114-117; Plaintiffs' Response at 16.) However, this also appears to be an effort by Plaintiffs to second-guess Novan's approach to studying the efficacy of SB204, or otherwise critique the trial design, a contention far beyond the challenges to the specific statements and omissions raised by the Complaint and covered by the Securities Laws.

report only information from optimal studies, even if scientists could agree on what is optimal." (internal citations and quotations omitted)). As noted above, Plaintiffs may, in hindsight, have a legitimate objection regarding how the Phase 3 trials were designed. However, Plaintiffs' attempts to second-guess the design of the trials is a far cry from establishing a securities law violation. Therefore, the Court concludes that Plaintiffs have failed to plausibly allege any materially misleading statement or omission to support a claim under Section 10(b).

4. Scienter

The Court further concludes that the allegations of the Complaint do not support the strong inference of scienter required for Plaintiffs' Section 10(b) claims. The Supreme Court has "made clear that raising a 'strong inference' of scienter is no small burden" and "the PSLRA 'unequivocally raised the bar for pleading scienter.'" Cozzarelli, 549 F.3d at 624 (quoting Tellabs, 127 S. Ct. at 2509). The question is not whether a reasonable person could infer that scienter existed, but whether the inference of scienter is "strong – and compelling, and powerful – when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." Id.; see also Hirtenstein v. Cempra, Inc., 2018 WL 5312783, at *16 ("'The key, of course, is the honest belief of the management in the truth of information issued to the public. If the management knows that certain facts will necessarily prevent the regulatory approval or the marketing of the drug and conceals these facts from the investing public, then there is scienter. There is also scienter if the management is reckless in dealing

with such adverse facts.'" (quoting In re AstraZeneca Sec. Litig., 559 F.Supp.2d at 470).

Here, Plaintiffs do not point to any individual profit motive or other specific basis for interring intent. Instead, Plaintiffs rely only on the contention that Defendants should have monitored the Phase 3 Trials, that the general efforts to raise capital at the IPO support motive, and that the departure of various executives after the disappointing Phase 3 Trials supports an inference of scienter. However, similar contentions have been rejected as insufficient. See Hirtenstein v. Cempra, 2018 WL 5312783 at *19-20;[9] Lerner v. Northwest

---

[9] As set out in Hirtenstein v. Cempra, 2018 WL 5312783, at *21:

> To be sure, Plaintiffs need not identify irrefutable evidence "of the 'smoking-gun' genre" in order to establish a strong inference of scienter. Tellabs, 551 U.S. at 324, 127 S.Ct. 2499. But their amended complaint fails to support a strong inference of scienter in this regard. For example, there is no allegation that the individual Defendants acted with a pecuniary motive for personal financial gain. See id. at 325, 127 S. Ct. 2499 (noting that allegations of "personal financial gain may weigh heavily in favor of a scienter inference," but are not dispositive). Every for-profit company is motivated by financial gain in our free enterprise system. Without more, Plaintiffs' allegations of motive and opportunity based on the company's need to raise capital are insufficient to establish a strong inference of scienter. See Cozzarelli, 549 F.3d at 627.
>
> Plaintiffs also argue that the fact that Fernandes was "terminated" soon after the class period supports an inference of scienter. Defendants note that the complaint alleges only that Fernandes "retired" in December of 2016 and contains no specific allegations that she was terminated as a result of the FDA disclosures. Without additional relevant factual allegations, "[s]ubsequent resignations by executives are insufficient to support a strong inference of scienter." In re Swisher Hygine, Inc., No. 3:12-MD-2384, 2015 WL 4132157, at *12 (W.D.N.C. July 8, 2015) (alteration in original) (quoting Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F.Supp.2d 571, 593-94 (E.D. Va. 2006)); Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 709 n.8 (9th Cir. 2016) ("We have cautioned securities plaintiffs that, absent some truly compelling allegations, we will not consider routine business behavior (like firing people or raising capital) to serve as the basis for scienter." (citation omitted)).
>
> Thus, the FDA did not conclude that Cempra's statements were factually inaccurate but simply determined that more data should be obtained before drawing those same positive interpretations. Therefore, the most compelling inference is that any disparity between the challenged statements and the information disclosed by the FDA appears to reflect a difference of opinion regarding the

Biotherapeutics, 273 F. Supp. 3d 573 (D. Md. 2017). As in Lerner, "Plaintiffs here do not allege that Defendants concealed an adverse recommendation from the FDA. They do not claim that Defendants mischaracterized a risk, constituting extreme departure from the standard of ordinary care. They do not allege that Defendants manufactured a "blessing" or "approval" by the FDA. Plaintiffs' allegations here simply do not establish a strong inference of scienter as required by the PSLRA." Lerner, 273 F. Supp. 3d at 594-95 (internal citations omitted). At most, Plaintiffs allege only that Defendants failed to include details regarding a specific suggestion by the FDA (a suggestion which Novan followed, given the ability to report separately on women on oral contraceptives with an acne indication), or misrepresented the studies as "identically designed." The facts as a whole more plausibly suggest that Defendants were acting innocently or negligently rather than deliberately misreporting material information or recklessly disregarding the truth. "Under the PSLRA pleading standard for scienter, given two plausible inferences of intent motivating the alleged false or misleading statements, one nefarious and one innocent, the court must weigh those competing inferences and determine whether plaintiff's inference of scienter is cogent and at least as compelling as defendants' inference." Hirtenstein v. Cempra, 2018 WL 5312783 at *22. Plaintiffs have not demonstrated how Defendants were reckless, much less deliberately misleading, and there is no basis to support the assertion that their conduct amounted to "an extreme departure from the standard of ordinary care." Lerner, 273 F.Supp.3d at 594.

---

interpretation of the clinical results, rather than a concerted effort to deceive the investing public. See In re AstraZeneca Sec. Litig., 559 F.Supp.2d at 471.

C. Plaintiffs' Claims under Section 20(a) of the 1934 Act

Plaintiffs also allege that the individual Defendants violated § 20(a) of the Exchange Act. Section 20(a) imposes liability on any person who "directly or indirectly, controls any person liable" for violations of Section 10(b), "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). In this case, Plaintiffs contend that each of the individual Defendants qualifies as a "control person" within the meaning of Section 20(a). However, because the court has concluded that Plaintiffs fail to state a claim regarding the predicate violation of Section 10(b), Plaintiffs' Section 20(a) claims also fail. See Hirtenstein v. Cempra, 2018 WL 5312783 at *28.

D. Plaintiffs' Claims under Section 11 and Section 12(a)(2) of the 1933 Act

Plaintiffs also assert claims under Section 11 and Section 12(a)(2) the 1933 Act, which covers claims for alleged false statements or omissions in the Registration Statement and Prospectus. Those claims do not require Plaintiffs to show that "the defendant acted with any intent to deceive or defraud." Omnicare, Inc., 135 S. Ct. at 1323 (internal quotation omitted). However, like the Section 10(b) claims, there must be a misrepresentation or omission of a material fact. See Plymouth, 966 F. Supp. 2d at 556 (citing Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004)); Basic Inc. v. Levinson, 485 U.S. 224 (1988). Thus, Plaintiffs must still show (1) an omission or misrepresentation, (2) of a material fact required to be stated or necessary to make other statements made not misleading.

In addition, although fraud may not be element of a claim under the 1933 Act, the heightened pleading standard of Rule 9(b) is nevertheless applicable to 1933 Act claims "where those allegations sound in fraud." Cozzarelli, 549 F.3d at 629. "When a plaintiff makes an allegation that has the substance of fraud, therefore, he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability" or by including a "conclusory disclaimer." Id. Similarly, where a plaintiff's alleged misleading statements for a Prospectus or Registration Statement are the same as his allegation of fraud under Section 10(b), Rule 9(b) is applicable. Id. The "1933 Act claims sound in fraud when the complaint alleges a single, coordinated scheme to defraud investors and utilizes the same allegations as the basis of both the 1933 Act and 1934 Act claims." Plymouth County, 966 F. Supp. 2d at 554 (internal quotation omitted). Thus, where "Plaintiffs incorporate wholesale the allegations used in pleading the 1933 Act claims in support of their allegations under the 1934 Act . . .[e]ven though they reference the word 'negligence' in pleading these claims, the mere label is not enough to transform the substance of the claims and thus avoid the pleading requirements of Rule 9(b). As such, the proper pleading standard used to assess Plaintiffs' 1933 Act claims is that of Rule 9(b)." Id. Here, Plaintiffs' allegations are all based on the same alleged misrepresentations and omissions, and Plaintiffs incorporate allegations of deliberate misconduct into the Section 11 claims, and incorporate the allegations supporting the Section 11 claims into the Section 10(b) claims. (Compl. ¶ 51, ¶ 132.) Therefore, the Court concludes that Plaintiffs' claims "sound in fraud," and under Cozzarelli the standards of Rule 9(b) apply

to Plaintiffs' Section 11 as 12(a)(2) claims.[10]

As set out in detail above, the Court has concluded that Plaintiffs have failed to plausibly allege a materially false statement or misleading omission in this case in order to state a claim under Section 10(b). For the same reasons, the Court concludes that Plaintiffs have failed to state a Section 11 or 12(a)(2) claim under the 1933 Act. Plaintiffs' contentions fail to support a reasonable inference that Defendants made a materially false statement or misleading omission, and the factual basis for Plaintiffs' claims is speculative and based on unwarranted inferences and unreasonable conclusions, based on the extended discussion set out in detail above.

The Court notes that Plaintiffs also allege that Defendants are liable under Section 11 because Defendants failed to disclose information required under Items 303 and 503 of Regulation S-K. 17 C.F.R. § 229.303(a)(3)(ii) and § 229.503(c). The Court will consider each of those provisions in turn.

1. Item 303

Item 303 requires a company to disclose "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact

---

[10] In the present case, as in Plymouth County, "[t]his analysis is a bit academic as Plaintiffs' claims would fail under the 1933 Act even if the pleading standard were that of Federal Rule of Civil Procedure 8(a). As discussed… Plaintiffs have failed to make any showing of materiality or falsity with respect to the challenged statements, and therefore the result would be the same regardless of the pleading standard used. As such, although the court finds that Rule 9(b) is the appropriate standard in this case, a contrary result would not change the outcome for Plaintiffs." Plymouth County Retirement, 966 F. Supp. 2d at 554 n.20.

on net sales or revenues or income from continuing operations." 17 C.F.R. § 222.303(a)(3)(ii).

> Item 303(a) "essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus." Kapps, 379 F.3d at 218 (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1191–92 (11th Cir.2002)). A plaintiff must plead that the defendant had actual knowledge of the alleged trend in order for liability to attach. See J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 391–92 (6th Cir.2008) (dismissing complaint where allegations demonstrated information was knowable, rather than known, to defendants because "duty of disclosure arising from Item 303 does require knowledge").
>
> Thus, Item 303(a) imposes a disclosure duty "'where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations.' " Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir.2011) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)). To state a claim based on a failure to comply with Item 303, a plaintiff must "allege facts showing defendants knew of an adverse trend, the material impact of that trend, and that the future material impacts are reasonably likely to occur from the present-day perspective." Mallen v. Alphatec Holdings, Inc., No. 10–cv–1673–BEN, 2013 WL 1294640, at *12 (S.D. Cal. Mar. 28, 2013) (internal citations and quotations omitted).

Plymouth County, 966 F. Supp. 2d at 557-68.

In this case, Plaintiffs allege that, "[a]ccordingly, the omission of facts regarding SB204's Phase 3 Trials constitutes a violation of Item 303 and renders the Offering Documents and the Securities Act Defendants' other statements materially false and misleading." (Compl. ¶ 55). However, the Complaint does not identify specific facts that were not disclosed in violation of Item 303. Plaintiffs' Response Brief attempts to clarify that

one known trend was that "as a result of feedback from the FDA, Novan was studying the effect of SB204 on women who were taking oral contraceptives with an acne indication" and "the Company was asked to separately report this data." (Pl. Resp. Br. at 20-21.) Plaintiffs rely upon Panther Partners, Inc. v. Ikanos Communs., Inc., 681 F.3d 114, 120-22 (2d Cir. 2012). But in Panther Partners, the company was receiving calls that its computer chips were defective, the issue was being discussed by the company's board, company representatives were traveling overseas to meet with purchasers of the chips, and these purchasers accounted for 72% of company revenue. The Second Circuit held that this was sufficient to state an Item 303 claim. As discussed above, Plaintiffs did not allege that the efficacy of SB204 was being questioned. The allegations here are that the FDA encouraged the Company to study and report its results pertaining to women on oral contraceptives with an acne indication. There is nothing in the pleadings beyond bare speculation (and hindsight) to suggest that the trials were not properly designed, nor that the efficacy of the drug had been questioned. Moreover, Plaintiffs have not identified "trends" or "uncertainties" under Item 303 that were not disclosed. Plaintiffs have failed to state a claim for any violation of Item 303.

2. Item 503

Item 503 requires that the Registration Statement, where appropriate, should include "a discussion of the most significant factors that make the offering speculative or risky. This discussion must be concise and organized logically." 17 C.F.R. § 229.503(c). "The Securities and Exchange Commission, in issuing guidance on this provision, has stated that a discussion

of risk factors should be specific to the particular company and its operations, and should explain how the risk affects the company and its operations, and should explain how the risk affects the company and/or the securities being offered." Plymouth County, 966 F. Supp. 2d at 559.

Plaintiffs contend that Novan's risk warnings were insufficient "because they failed to disclose known risks resulting from the inclusion of women on birth control with an acne indication." (Pl. Resp. Br. at 21.) However, as set out above, Novan disclosed the uncertainty and complexity of the clinical trial process, as well as its relative inexperience with Phase 3 trials. In the circumstances, it appears that Novan disclosed the "most significant factors" that made the offering risky or speculative. In addition, as discussed at length above, Plaintiffs' contentions regarding the inclusion of women on oral contraceptives with an acne indication are based upon speculation and efforts to second-guess the drug trials in hindsight. In the circumstances, and based on the extended discussion set out above regarding those contentions, the Court finds that Plaintiffs have failed to state a claim for failing to disclose the most significant factors that made the offering speculative or risky under Item 503.

For all of these reasons, Plaintiffs' Section 11 and Section 12(a)(2) claims should also be dismissed.

E. Plaintiffs' claims under Section 15

"Like the Section 20(a) claim under the 1934 Act, Section 15 establishes 'control person' liability. Further, like its 1934 Act counterpart, Section 15 is also dependent on an

underlying violation of the relevant securities laws, meaning that if there is no violation of Section 11 or 12(a)(2), there is no violation of Section 15." Plymouth County, 966 F. Supp. 2d at 557. Therefore, because the Section 11 and 12(a)(2) claims should be dismissed, there is no primary violation of the securities laws, and the Section 15 claim should be dismissed as well.

## III. CONCLUSION

For the reasons set out above, the Court concludes that Plaintiffs have failed to state a claim upon which relief can be granted under Section 11, Section 12(a)(2), and Section 15 of the 1933 Act, and Section 10(b) and Section 20(a) of the 1934 Act, as set out in detail above.

IT IS THEREFORE RECOMMENDED that Defendants' Motions to Dismiss [Doc. #47, #50] be granted.

This, the 30th day of November, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge